# COMPOSITE
# EXHIBIT 5

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:

DARWIN HUMBERTO CORTEZ MARTINEZ,

     Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

     Defendants.

_____/

## SUMMONS

**TO:**   **MSC Cruise Management (UK) Ltd**
       **c/o Joel Dovico, Esq. – Registered Agent**
       **MSC Cruises (USA) Inc.**
       **6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309**
       **Business agent of the named Defendant**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:   L. Alex Perez, Esq.
                        LIPCON, MARGULIES & WINKLEMAN, P.A.
                        One Biscayne Tower, Suite 1776
                        2 South Biscayne Boulevard
                        Miami, Florida 33131
                        Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

CLERK _____

(BY) DEPUTY CLERK

_____
**BRENDA D. FORMAN**

MAY 05 2021
_____
DATE

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:

DARWIN HUMBERTO CORTEZ MARTINEZ,

      Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

      Defendants.

_____/

## SUMMONS

**TO:**   **MSC Malta Seafarers Company Limited
c/o Joel Dovico, Esq. – Registered Agent
MSC Cruises (USA) Inc.
6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309
Business agent of the named Defendant**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:  L. Alex Perez, Esq.
                               LIPCON, MARGULIES & WINKLEMAN, P.A.
                               One Biscayne Tower, Suite 1776
                               2 South Biscayne Boulevard
                               Miami, Florida 33131
                               Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service
of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default
will be taken against you for the relief demanded in the complaint. You must also file your answer
with the Clerk of this Court within a reasonable period of time after service.

MAY 05 2021

CLERK                                  DATE

(BY) DEPUTY CLERK

BRENDA D. FORMAN

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:

DARWIN HUMBERTO CORTEZ MARTINEZ,

     Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

     Defendants.

_____/

## SUMMONS

TO:   **MSC Cruises S.A. Co**
      **c/o Joel Dovico, Esq. – Registered Agent**
      **MSC Cruises (USA) Inc.**
      **6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309**
      **Business agent of the named Defendant**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:   L. Alex Perez, Esq.
                          LIPCON, MARGULIES & WINKLEMAN, P.A.
                          One Biscayne Tower, Suite 1776
                          2 South Biscayne Boulevard
                          Miami, Florida 33131
                          Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

_____      MAY 05 2021
CLERK                                 DATE

(BY) DEPUTY CLERK

BRENDA D. FORMAN

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:

DARWIN HUMBERTO CORTEZ MARTINEZ,

    Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

    Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, DARWIN HUMBERTO CORTEZ MARTINEZ, by and through undersigned counsel, hereby files this Complaint and Demand for Jury Trial against Defendants, MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD., and in support thereof, alleges:

### PRELIMINARY ALLEGATIONS

1. This is a Complaint for Damages in excess of $30,000.00 (thirty thousand dollars), exclusive of costs and interest.

2. Plaintiff, DARWIN HUMBERTO CORTEZ MARTINEZ, is a citizen of El Salvador.

3. Defendants, MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD., are incorporated in a foreign state(s), but do business in Florida through their agent, MSC Cruises (USA) Inc., whose Broward, Florida office is located at: 6750 N. Andrews Ave. Suite 100, Ft. Lauderdale, FL 33309.

4.   In view of Defendants doing business in Florida through MSC Cruises (USA) Inc., whose Broward, Florida office is located at: 6750 N. Andrews Ave. Suite 100, Ft. Lauderdale, FL 33309, Defendants committed one or more of the acts stated in F.S. §§ 48.193, 48.081 and/or 48.181; and, as such, Defendants are subject to the jurisdiction of the Courts of this State.[1]

5.   The causes of action asserted in this Complaint arise under the Jones Act, 46 U.S.C. § 30104, and the General Maritime Law of the United States.

6.   At all times material hereto, Plaintiff worked aboard the vessel, *MSC Poesia* ("the vessel") and held the status of a Jones Act Seaman vis-à-vis the vessel and the named Defendants herein. The vessel was registered in a flag of convenience country and at all times material was operated in navigable waters.

7.   At all times material, one or more of the Defendants owned, operated, managed, maintained, and/or controlled the vessel. In addition and/or in the alternative, at all times material, one or more of the Defendants were the agent(s) of the vessel owner, as they were subject to the vessel owner(s)'s control. Further, at all times material hereto, one or more of the Defendants was(were) Plaintiff's employer(s), as they controlled different aspects of Plaintiff's work aboard the vessel.[2]

8.   Between September and December 2019, Plaintiff presented to the medical center aboard the subject vessel on several different occasions with complaints of intense headaches; during that same time span, Defendants' shipboard medical personnel, including Defendants' shipboard

---

[1] Defendant, MSC CRUISES S.A. CO., was Florida-registered business as late as September 25, 2020.

[2] Upon information and belief, Defendant, MSC CRUISES S.A. CO., owned the subject vessel; Defendant, MSC MALTA SEAFARERS COMPANY LIMITED, was one of Plaintiff's employers, along with the other named Defendants, and Defendant, MSC CRUISE MANAGEMENT (UK) LTD. controlled some operational aspects of the subject vessel.

LIPCON, MARGULIES & WINKLEMAN, P.A.

doctors and nurses, examined Plaintiff and consistently documented the fact that Plaintiff was suffering from uncontrollable high blood pressure.

9.  Despite Defendants' awareness of Plaintiff's consistent complaints of headaches and his consistently high and controllable blood pressure between September and December 2019, Defendants' shipboard medical personnel: i) failed to promptly and/or properly diagnose Plaintiff's underlying medical (*i.e.* kidney) condition; ii) failed to promptly and/or properly treat Plaintiff's underlying medical (*i.e.* kidney) condition; and iii) directly caused Plaintiff further medical injury by negligently prescribing Plaintiff medication contraindicated for, and which aggravated, his underlying medical (*i.e.* kidney) condition; for example, Furosemide.

10. As a result of Defendants above outlined negligent conduct, Defendants directly caused Plaintiff to suffer medical (*i.e.* kidney(s) and cardiovascular) injuries; Defendants' failed to provide Plaintiff prompt, proper and adequate medical treatment aboard the vessel and/or shoreside; and Plaintiff thereby became injured and his underlying medical conditions (*i.e.* kidney and subsequently cardiovascular) became aggravated.

### COUNT I – JONES ACT NEGLIGENCE AGAINST DEFENDANTS

Plaintiff re-alleges, incorporates by reference, and adopts paragraphs one (1) through ten (10) as though originally alleged herein, and further alleges:

11. On or about the above dates, Plaintiff was employed by one or more of the Defendants as a Jones Act seaman and was a member of the vessel's crew.

12. At all times material hereto, it was the duty of one or more of the Defendants to provide Plaintiff with a reasonably safe place to work, including the provision of prompt, proper and adequate medical treatment aboard the vessel and shoreside.

13. Plaintiff's injuries were caused by the fault and negligence of Defendants and/or its agents, servants, and/or employees as follows:

    a. Failure to use reasonable care to provide Plaintiff with a reasonably safe place to work; and/or

    b. Failure to promptly, properly, and adequately diagnose and treat Plaintiff's underlying medical condition when he presented to the vessel's medical center and as he continued to complain as his medical condition and related injuries became aggravated; and/or

    c. Failure to provide Plaintiff with prompt, proper, and adequate medical care when he sought medical attention for his medical conditions and related injuries; and/or

    d. Failure to select, retain and/or utilize competent, skilled and properly trained medical care providers onboard and shoreside with which to provide Plaintiff prompt, proper and adequate medical care; and/or

    e. Failure to carry onboard the vessel proper and adequate medical equipment with which to provide Plaintiff prompt, proper and adequate medical care; and/or

    f. Failure to properly medically manage Plaintiff's medical care after Plaintiff became injured; and/or

    g. Failure to provide prompt, proper, and adequate medical care, which aggravated Plaintiff's medical condition, related injuries, and caused him additional pain and disability; and/or

    h. Failure to timely disembark Plaintiff to provide prompt, proper, and adequate medical treatment ashore without delay; and/or

    i. Sending Plaintiff back to work when he was medically unfit to do so; and/or

    j. Creating a work environment where crewmembers are encouraged to return to work with injuries; and/or

    k. Failure to warn Plaintiff of the dangers of working with a medical injury/ies; and/or

    l. Failure to provide Plaintiff and other crewmembers who were associated with Plaintiff or Plaintiff's incident giving rise to this action, reasonable hours of employment so as to not overwork them to the point of not being physically fit to carry out their duties, as Defendants' employees, including Plaintiff, were overworked to the point of fatigue; and/or

LIPCON, MARGULIES & WINKLEMAN, P.A.

m. Failure to promulgate and enforce reasonable rules and regulations to ensure the safety and health of the employees, and more particularly the Plaintiff, while engaged in the course of his employment on said vessel; and/or

n. Failure to provide Plaintiff with enough sleeping time so as to cause Plaintiff and the other crewmembers on the vessels the same physical and mental impairments as being drunk. These types of impairments have been documented in the Journal of Occupational and Environmental Medicine; 57:649-655 (October 2000); and/or

o. Failure to adhere to the Seafarers' Hours of Work and the Manning of Ships Convention, 1996, with respect to the hours of work and rest, as well as other standards, such as ILO 147; and/or

p. Failure to follow sound management practices with the goal of providing Plaintiff a safe place to work; and/or

q. Failure to have a proper, adequate and safe Safety Management System Manual and/or violating the International Safety Management Code.

14. At all times material hereto, Defendants knew of the foregoing conditions causing Plaintiff's medical injuries and did not correct them, or the conditions existed for a sufficient length of time so that Defendant(s) in the exercise of reasonable care should have learned of them and corrected them.

15. As a result of the negligence of Defendants, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain and suffering, mental anguish, reasonable fear of developing future physical and medical problems, loss of enjoyment of life, physical disability, impairment, inconvenience on the normal pursuits and pleasures of life, feelings of economic insecurity caused by disability, incurred medical expenses in the care and treatment of Plaintiff's injuries, suffered physical handicap, lost wages, income lost in the past, and his working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff in the past and in the future has lost the fringe benefits that come with Plaintiff's job, including but

not limited to found, free food, free shelter, free medical care, free uniforms, vacation, and free airline ticket home and back.

**WHEREFORE,** Plaintiff demands all damages entitled by law.

### COUNT II – UNSEAWORTHINESS AGAINST DEFENDANTS

Plaintiff re-alleges, incorporates by reference, and adopts paragraphs one (1) through ten (10) as though originally alleged herein, and further alleges:

16. On or about the above date, Plaintiff was a seaman and a member of the member of the vessel's crew, which was in navigable waters.

17. At all times material hereto, the vessel was owned, managed, operated and/or controlled by one or more of the Defendant(s).

18. At all times material hereto, one or more Defendants had the absolute, non-delegable duty to provide Plaintiff with a seaworthy vessel on which she served.

19. On or about the above date, the unseaworthiness of the vessel was a legal cause of injury and damage to the Plaintiff by reason of the following:

    a. The vessel was not reasonably fit for its intended purpose; and/or

    b. The vessel's crew, including Defendants' shipboard doctors, were not properly trained, instructed and/or supervised; and/or

    c. The vessel did not have a fit crew; and/or

    d. The vessel's medical personnel were not properly trained, monitored and/or supervised to promptly, properly, and adequately diagnose and treat Plaintiff's medical condition when he presented to the vessel's medical center and as he continued to complain as his condition became aggravated; and/or

    e. The vessel's medical personnel were not properly trained, monitored and/or supervised to provide Plaintiff with prompt, proper, and adequate medical care when he sought medical attention for his emergency medical condition; and/or

    f.   The vessel failed to carry and utilize competent, skilled and properly trained medical care providers on board and shoreside to provide Plaintiff with prompt, proper and adequate medical care; and/or

    g.   The vessel failed to carry and utilize proper and adequate medical equipment with respect to treating Plaintiff's conditions; and/or

    h.   The vessel failed to carry and utilize properly trained medical providers to medically manage Plaintiff's medical care after he was injured; and/or

    i.   The vessel failed to carry and utilize properly trained medical providers to provide Plaintiff prompt, proper, and adequate medical care, which aggravated his injuries and caused him additional pain and disability; and/or

    j.   The creation of an environment onboard where the crew and Plaintiff were overworked to the point of being so exhausted that they were not physically fit to carry out their duties.

20. At all times material hereto, Defendants knew of the foregoing conditions causing Plaintiff's medical injuries and did not correct them, or the conditions existed for a sufficient length of time so that Defendant(s) in the exercise of reasonable care should have learned of them and corrected them.

21. As a result of the unseaworthiness of the vessel, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain and suffering, mental anguish, reasonable fear of developing future physical and medical problems, loss of enjoyment of life, physical disability, impairment, inconvenience on the normal pursuits and pleasures of life, feelings of economic insecurity caused by disability, incurred medical expenses in the care and treatment of Plaintiff's injuries, suffered physical handicap, lost wages, income lost in the past, and Plaintiff's working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, Plaintiff in the past and in the future has lost the fringe benefits that come with Plaintiff's job,

including but not limited to found, free food, free shelter, free medical care, free uniforms, vacation, and free airline ticket home and back.

**WHEREFORE,** Plaintiff demands all damages entitled by law.

## COUNT III – FAILURE TO PROVIDE MAINTENANCE AND CURE AGAINST DEFENDANTS

Plaintiff re-alleges, incorporates by reference, and adopts paragraphs one (1) through ten (10) as though originally alleged herein, and further alleges:

22. On or about the above date, Plaintiff was injured while in the service of the vessel as a Jones Act seaman.

23. Under the General Maritime Law, Plaintiff, as a seaman, is entitled to recover maintenance and cure from his employer(s), one or more of the Defendants, until Plaintiff is declared to have reached Maximum Medical Improvement (MMI) and/or Maximum Medical Cure (MMC). Maintenance and cure includes unearned wages (regular wages, overtime, vacation pay and tips), which were reasonably anticipated to the end of the contract or voyage, whichever is longer. In addition, an MMI declaration must be unequivocal, and if not, any doubts or controversy, regarding whether or not the seaman is at MMI must be resolved in favor of the seaman.

24. To date, Plaintiff has not reached MMI because no doctor has declared that Plaintiff has achieved MMI as it relates to his kidney or cardiovascular injuries; as such, Plaintiff is entitled to receive medical treatment from physicians of his choice as Defendants' expense. *See Costa Crociere, S.p.A. v. Rose*, 939 F.Supp. 1538 (S.D. Fla. 1996) (holding that since seaman had not reached maximum medical improvement, because continued dialysis or kidney transplant offered possibility of betterment in seaman's physical "condition," employer thus had a continuing obligation to provide maintenance and cure).

25. At all times material hereto, Defendant(s) willfully and callously delayed, failed and/or refused to pay Plaintiff's entire maintenance and cure, and/or Defendant(s) willfully and callously delayed, failed and/or refused to provide the Plaintiff the level of cure that the Plaintiff needs to achieve MMI, so that Plaintiff has become obligated to pay the undersigned a reasonable attorney's fee.

26. At all times material hereto, Defendant(s)'s failure to provide Plaintiff's entire maintenance and cure is willful, arbitrary, capricious, in violation of the law, and in callous disregard for Plaintiff's right as a seaman.  As such, Plaintiff would be entitled to attorney's fees under the General Maritime Law of the United States.

27. At all times material hereto, Defendant(s)'s unreasonable and/or callous failure to pay or provide Plaintiff with maintenance and cure aggravated Plaintiff's condition and caused him to suffer additional compensatory damages, including, but not limited to, the aggravation of Plaintiff's injuries and further caused him disability, pain and suffering, reasonable fear of developing future physical and medical problems, mental anguish, loss of enjoyment of life, feelings of economic insecurity as well as lost earnings or earning capacity, and medical and hospital expenses in the past and into the future.

WHEREFORE, Plaintiff demands all damages entitled by law.

## COUNT IV – FAILURE TO PROVIDE PROMPT, PROPER AND ADEQUATE MEDICAL CARE AGAINST DEFENDANTS

Plaintiff re-alleges, incorporates by reference, and adopts paragraphs one (1) through ten (10) as though originally alleged herein, and further alleges:

28. On or about the above dates, Plaintiff was employed by one or more of the Defendants as a seafarer and was a member of the vessel's crew. The vessel at all times material sailed in navigable waters.

29. At all times material hereto, it was the duty of Defendant(s) to provide Plaintiff with prompt, proper, and adequate medical care.

30. At all times material hereto, Defendant(s), through the shipboard and/or shoreside physicians and/or nurses, negligently failed to provide Plaintiff with prompt, proper, adequate, and complete medical care. This conduct includes, but is not limited to:

a. Failure to promptly, properly, and adequately diagnose and treat Plaintiff's medical condition(s) and related injuries when he presented to the vessel's medical center and as he continued to complain as his condition/medical injuries became aggravated; and/or

b. Failure to provide Plaintiff with prompt, proper, and adequate medical care when he sought medical attention for his medical condition(s) and related injuries; and/or

c. Failure to select, retain and/or utilize competent, skilled and properly trained medical care providers on board and shoreside to provide Plaintiff with prompt, proper and adequate medical care; and/or

d. Failure to utilize proper and adequate medical equipment with which to provide Plaintiff proper and adequate medical care; and/or

e. Failure to properly medically manage Plaintiff's medical care after he became injured by Defendants; and/or

f. Failure to provide Plaintiff prompt, proper, and adequate medical care, which aggravated his underlying medical condition and caused him medical injuries and additional pain and disability; and/or

g. Failure to timely disembark Plaintiff to provide prompt, proper, and adequate medical treatment ashore without delay; and/or

h. Sending Plaintiff back to work while he was still medically unfit to do so; and/or

i. Not reimbursing and/or not timely reimbursing Plaintiff for his out-of-pocket medical expenses, and/or

j. Not authorizing and/or providing Plaintiff with prompt shoreside medical care, and/or

k. Prematurely terminating Plaintiff medical care.

31. At all times material hereto, Defendants knew of the foregoing conditions causing Plaintiff's medical injuries and did not correct them, or the conditions existed for a sufficient length of time so that Defendant(s) in the exercise of reasonable care should have learned of them and corrected them.

32. As a direct and proximate result of Defendant(s)'s failure, Plaintiff suffered additional pain, disability and/or Plaintiff's recovery was prolonged. In addition, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain and suffering, mental anguish, reasonable fear of developing future physical and medical problems, loss of enjoyment of life, physical disability, impairment, inconvenience on the normal pursuits and pleasures of life, feelings of economic insecurity caused by disability, incurred additional medical expenses in the care and treatment of Plaintiff's injuries, suffered physical handicap, lost wages, income lost in the past, and Plaintiff's working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future.

33. This Count is alleged separately from Jones Act Negligence pursuant to *Joyce v. Atlantic Richfield Company*, 651 F. 2d 676 (10th Cir. 1981), which states, in part, "Negligent failure to provide prompt medical attention to a seriously injured seaman gives rise to a separate claim for relief [for which separate damages are awardable]."

**WHEREFORE,** Plaintiff demands all damages entitled by law.

## COUNT V – DISABILIATY CLAIM AGAINST DEFENDANTS

Plaintiff re-alleges, incorporates by reference, and adopts paragraphs one (1) through ten (10) as though originally alleged herein, and further alleges:

34. Pursuant to the employment agreement(s) between Defendants and Plaintiff, Plaintiff is entitled to damages in the event that he suffers a permanent disability and/or is unable to return to her profession as a seafarer as a result of an injury sustained during the course of her employment with Defendants.

35. As a result of the injury outlined above, Plaintiff suffered a permanent disability and/or lost her ability to return to his profession as a seafarer.

36. Clamant hereby demands the maximum disability payment provided by the employment agreement(s) between Plaintiff and Defendants, in addition to, and irrespective of, his rights and causes of action available under the Jones Act and/or General Maritime Law.

**WHEREFORE,** Plaintiff demands all damages entitled by law and contract.

Dated: May 4, 2021.

Respectfully submitted,

LIPCON, MARGULIES,
& WINKLEMAN, P.A.
*Attorneys for Plaintiff*
One Biscayne Tower, Suite 1776
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 373-3016
Facsimile: (305) 373-6204

By: */s/ L. Alex Perez*
**MICHAEL A. WINKLEMAN**
Florida Bar No. 36719
mwinkleman@lipcon.com
**JACQUELINE GARCELL**
Florida Bar No. 104358
jgarcell@lipcon.com
**L. ALEX PEREZ**
Florida Bar No.: 125452
aperez@lipcon.com

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.    CASE STYLE

IN THE CIRCUIT COURT OF THE <u>SEVENTEENTH</u>  JUDICIAL CIRCUIT, IN AND FOR <u>BROWARD</u>  COUNTY, FLORIDA

<u>DARWIN HUMBERTO CORTEZ MARTINEZ</u>
Plaintiff

Case # _____

Judge _____

vs.

<u>MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, MSC CRUISE MANAGEMENT (UK) LTD.</u>
Defendant

### II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

### III.   TYPE OF CASE     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

## CIRCUIT CIVIL

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☒ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

## COUNTY CIVIL

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**    **NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

   <u>5</u>

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Luis Alexander Perez</u>        Fla. Bar # <u>125452</u>
          Attorney or party                  (Bar # if attorney)

<u>Luis Alexander Perez</u>           <u>05/04/2021</u>
(type or print name)           Date

# IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN
## AND FOR BROWARD COUNTY, FLORIDA

Case No: _CACE-21-009008_

~~DARWIN HUMBERTO~~
~~CORTEZ MARTINEZ~~
Plaintiff

Judge Division: _____ 21 _____

VS

~~MSC Cruises SA Co.,~~
Defendant

F I L E D
MAY 05 2021
By _____

## CLERK'S CERTIFICATE OF COMPLIANCE

I hereby certify that pursuant to Administrative Order, No. 2020–73Civ/2020–74–UFC: "ADMINISTRATIVE ORDER DIRECTING CLERK OF COURTS WITH REGARD TO DISMISSED CIVIL OR FAMILY CASES",

The Clerk has conducted a search for all previous existing civil cases related to these two parties.

Listed below are all the aforementioned related cases:   NONE

Brenda D. Forman
Circuit and County Courts

By: _____

Deputy Clerk

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 2021-CA-009008

DARWIN HUMBERTO CORTEZ MARTINEZ,

     Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

     Defendants.

_____/

## ALIAS SUMMONS

**TO:**   **MSC Malta Seafarers Company Limited**
      **c/o Joel Dovico, Esq. – Registered Agent**
      **MSC Cruises (USA) Inc.**
      **1. 6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309; and/or**
      **2. 21659 Marigot Dr., Boca Raton, FL 33428; and/or**
      **3. 46TH SW Ave., Apt. 103, Pompano Beach, FL, 33069**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:   L. Alex Perez, Esq.
                      LIPCON, MARGULIES & WINKLEMAN, P.A.
                      One Biscayne Tower, Suite 1776
                      2 South Biscayne Boulevard
                      Miami, Florida 33131
                      Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

JUN 28 2021

_____
DATE

CLERK OF CIRCUIT & COUNTY COURT

(BY) DEPUTY CLERK

**BRENDA D. FORMAN**

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 2021-CA-009008

DARWIN HUMBERTO CORTEZ MARTINEZ,

     Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

     Defendants.

_____/

## ALIAS SUMMONS

**TO:**   **MSC Cruise Management (UK) LTD.**
      **c/o Joel Dovico, Esq. – Registered Agent**
      **MSC Cruises (USA) Inc.**
      **1. 6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309; and/or**
      **2. 21659 Marigot Dr., Boca Raton, FL 33428' and/or**
      **3. 46TH SW Ave., Apt. 103, Pompano Beach, FL, 33069**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:   L. Alex Perez, Esq.
                  LIPCON, MARGULIES & WINKLEMAN, P.A.
                  One Biscayne Tower, Suite 1776
                  2 South Biscayne Boulevard
                  Miami, Florida 33131
                  Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

CLERK

(BY) DEPUTY CLERK

**BRENDA D. FORMAN**

JUN 28 2021

DATE

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 2021-CA-009008

DARWIN HUMBERTO CORTEZ MARTINEZ,

       Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

       Defendants.

_____/

## ALIAS SUMMONS

TO:   MSC Cruises S.A. Co .
       c/o Joel Dovico, Esq. – Registered Agent
       MSC Cruises (USA) Inc.
       1.  6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309; and/or
       2.  21659 Marigot Dr., Boca Raton, FL 33428' and/or
       3.  46TH SW Ave., Apt. 103, Pompano Beach, FL, 33069

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:   L. Alex Perez, Esq.
                              LIPCON, MARGULIES & WINKLEMAN, P.A.
                              One Biscayne Tower, Suite 1776
                              2 South Biscayne Boulevard
                              Miami, Florida 33131
                              Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service
of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default
will be taken against you for the relief demanded in the complaint. You must also file your answer
with the Clerk of this Court within a reasonable period of time after service.

CLERK                          JUN 28 2021

                                DATE

(BY) DEPUTY CLERK

**BRENDA D. FORMAN**

## RETURN OF NON-SERVICE

**ORIGINAL**

| State of Florida | County of Broward | Circuit Court |
|---|---|---|

Case Number: CACE-21-009008

Plaintiff:
**DARWIN HUMBERTO CORTEZ MARITINEZ**

vs.

Defendant:
**MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD**

EQE2021000514

For:
L. Alex Perez, Esquire
Lipcon Margulies Alsina & Winkleman, P.A.
2 South Biscayne Boulevard
One Biscayne Tower / Suite 1776
Miami, FL 33131

Received by Pro Servers, Inc. on the 19th day of May, 2021 at 2:00 pm to be served on **MSC CRUISE MANAGEMENT (UK) LTD c/o MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE, 6750 NORTH ANDREWS AVENUE, SUITE 100, FORT LAUDERDALE, Broward County, FL 33309.**

I, Francisco J. Colon, do hereby affirm that on the **25th day of May, 2021 at 3:37 pm, I:**

**NON-SERVED** the Civil Action Summons and Complaint And Demand For Jury Trial for the reason that I failed to find **MSC CRUISE MANAGEMENT (UK) LTD c/o MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE** or any information to allow further search.  Read the comments below for further details.

**Additional Information pertaining to this Service:**
5/25/2021 3:37 pm  Attempted service at 6750 NORTH ANDREWS AVENUE, SUITE 100, FORT LAUDERDALE, FL  33309, office still closed for the pandemic. Paper posted on door: Please call 877 665 4655 or email MSCCRUISESUSA.COM for customer service

I certify that I am over 18 and have no interest in the above action, and am a Special Process Server, in good standing, in the 17th Judicial Circuit in and for Broward County, FL. Under penalties of perjury, I declare that I have read the foregoing Return of Service and that the facts stated in it are true.  Notary Not Required (F.S. 92.525).

Francisco J. Colon
SPS #593

**Pro Servers, Inc.**
**214 Apache Street**
**Tavernier, FL 33070**
**(305) 741-7761**

Our Job Serial Number: EQE-2021000514
Ref: CORTEZ MARITINEZ/ MSC CRUISES

Case Number: CACE-21-009008 Division: 21

Filing # 126125642 E-Filed 05/04/2021 01:15:13 PM

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:

DARWIN HUMBERTO CORTEZ MARTINEZ,

    Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

    Defendants.

_____/

### SUMMONS

TO:   **MSC Cruise Management (UK) Ltd**
      **c/o Joel Dovico, Esq. – Registered Agent**
      **MSC Cruises (USA) Inc.**
      **6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309**
      **Business agent of the named Defendant**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:  L. Alex Perez, Esq.
                       LIPCON, MARGULIES & WINKLEMAN, P.A.
                       One Biscayne Tower, Suite 1776
                       2 South Biscayne Boulevard
                       Miami, Florida 33131
                       Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

MAY 05 2021

CLERK                         DATE

(BY) DEPUTY CLERK

BRENDA D. FORMAN

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN, CLERK 05/04/2021 01:15:10 PM.****


## RETURN OF NON-SERVICE

**State of Florida**                    **County of Broward**                    **Circuit Court**

Case Number: CACE-21-009008

Plaintiff:
**DARWIN HUMBERTO CORTEZ MARITINEZ**

vs.

Defendant:
**MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD**

For:
L. Alex Perez, Esquire
Lipcon Margulies Alsina & Winkleman, P.A.
2 South Biscayne Boulevard
One Biscayne Tower / Suite 1776
Miami, FL 33131

Received by Pro Servers, Inc. on the 19th day of May, 2021 at 2:00 pm to be served on **MSC CRUISES S.A. CO c/o MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE, 6750 NORTH ANDREWS AVENUE, SUITE 100, FORT LAUDERDALE, Broward County, FL 33309.**

I, Francisco J. Colon, do hereby affirm that on the **25th day of May, 2021 at 3:37 pm, I:**

**NON-SERVED** the Civil Action Summons and Complaint And Demand For Jury Trial for the reason that I failed to find **MSC CRUISES S.A. CO c/o MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE** or any information to allow further search. Read the comments below for further details.

**Additional Information pertaining to this Service:**
5/25/2021 3:37 pm  Attempted service at 6750 NORTH ANDREWS AVENUE, SUITE 100, FORT LAUDERDALE, FL 33309, office still closed for the pandemic. Paper posted on door: Please call 877 665 4655 or email MSCCRUISESUSA.COM for customer service

I certify that I am over 18 and have no interest in the above action, and am a Special Process Server, in good standing, in the 17th Judicial Circuit in and for Broward County, FL. Under penalties of perjury, I declare that I have read the foregoing Return of Service and that the facts stated in it are true. Notary Not Required (F.S. 92.525).

Francisco J. Colon
SPS #593

**Pro Servers, Inc.**
**214 Apache Street**
**Tavernier, FL 33070**
**(305) 741-7761**

Our Job Serial Number: EQE-2021000513
Ref: CORTEZ MARITINEZ/ MSC CRUISES

Case Number: CACE-21-009008 Division: 21

Filing # 126125642 E-Filed 05/04/2021 01:15:13 PM

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:

DARWIN HUMBERTO CORTEZ MARTINEZ,

    Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

    Defendants.

_____/

Job # 0513
Date: 5/5/21   Time: 3-37 pm
Initials: PSC   ID #: 593
Military: Y/N   Married: Y/N

NIS

## SUMMONS

TO:    MSC Cruises S.A. Co
    c/o Joel Dovico, Esq. – Registered Agent
    MSC Cruises (USA) Inc.
    6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309
    Business agent of the named Defendant

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:    L. Alex Perez, Esq.
    LIPCON, MARGULIES & WINKLEMAN, P.A.
    One Biscayne Tower, Suite 1776
    2 South Biscayne Boulevard
    Miami, Florida 33131
    Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

MAY 05 2021

CLERK               DATE

(BY) DEPUTY CLERK

**BRENDA D. FORMAN**

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 05/04/2021 01:15:10 PM.****

RETURN OF NON-SERVICE

ORIGINAL

**State of Florida**                    **County of Broward**                    **Circuit Court**

Case Number: CACE-21-009008

Plaintiff:
**DARWIN HUMBERTO CORTEZ MARITINEZ**

vs.

Defendant:
**MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD**

EQE2021000515

For:
L. Alex Perez, Esquire
Lipcon Margulies Alsina & Winkleman, P.A.
2 South Biscayne Boulevard
One Biscayne Tower / Suite 1776
Miami, FL 33131

Received by Pro Servers, Inc. on the 19th day of May, 2021 at 2:00 pm to be served on **MSC MALTA SEAFARERS COMPANY LIMITED c/o MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE, 6750 NORTH ANDREWS AVENUE, SUITE 100, FORT LAUDERDALE, Broward County, FL 33309.**

I, Francisco J. Colon, do hereby affirm that on the **25th day of May, 2021** at **3:38 pm**, I:

**NON-SERVED** the Civil Action Summons and Complaint And Demand For Jury Trial for the reason that I failed to find **MSC MALTA SEAFARERS COMPANY LIMITED c/o MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE** or any information to allow further search. Read the comments below for further details.

**Additional Information pertaining to this Service:**
5/25/2021  3:38 pm  Attempted service at 6750 NORTH ANDREWS AVENUE, SUITE 100, FORT LAUDERDALE, FL 33309, office still closed for the pandemic. Paper posted on door: Please call 877 665 4655 or email MSCCRUISESUSA.COM for customer service

I certify that I am over 18 and have no interest in the above action, and am a Special Process Server, in good standing, in the 17th Judicial Circuit in and for Broward County, FL. Under penalties of perjury, I declare that I have read the foregoing Return of Service and that the facts stated in it are true.  Notary Not Required (F.S. 92.525).

Francisco J. Colon
SPS #593

**Pro Servers, Inc.**
**214 Apache Street**
**Tavernier, FL 33070**
**(305) 741-7761**

Our Job Serial Number: EQE-2021000515
Ref: CORTEZ MARITINEZ/ MSC CRUISES

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.0n

Filing # 126125642 E-Filed 05/04/2021 01:15:13 PM

Case Number: CACE-21-009008 Division: 21

IN THE CIRCUIT COURT OF THE
17ᵀᴴ JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:

DARWIN HUMBERTO CORTEZ MARTINEZ,

    Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

    Defendants.

_____/

## SUMMONS

TO:   **MSC Malta Seafarers Company Limited**
      **c/o Joel Dovico, Esq. – Registered Agent**
      **MSC Cruises (USA) Inc.**
      **6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309**
      **Business agent of the named Defendant**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:  L. Alex Perez, Esq.
                       LIPCON, MARGULIES & WINKLEMAN, P.A.
                       One Biscayne Tower, Suite 1776
                       2 South Biscayne Boulevard
                       Miami, Florida 33131
                       Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

CLERK OF THE COURT

MAY 05 2021

DATE

(BY) DEPUTY CLERK

**BRENDA D. FORMAN**

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 05/04/2021 01:15:10 PM.****

## RETURN OF SERVICE



**ORIGINAL**

State of Florida

County of Broward

Circuit Court

Case Number: CACE-21-009008

Plaintiff:
**DARWIN HUMBERTO CORTEZ MARITINEZ**
vs.
Defendant:
**MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE
MANAGEMENT (UK) LTD**



EQE2021000663

For: L. Alex Perez, Esquire
Lipcon Margulies Alsina & Winkleman, P.A.

Received by Pro Servers, Inc. on the 28th day of June, 2021 at 10:30 am to be served on MSC MALTA SEAFARERS COMPANY LIMITED c/o
MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE, 21659 MARIGOT DRIVE, BOCA RATON, Palm Beach
County, FL 33428. I, WAYNE Z. Pollick, do hereby affirm that on the 29 day of June, 2021 at 8:45pm,
executed service by delivering a true copy of the Alias Civil Action Summons and Complaint And Demand For Jury Trial in accordance with
state statutes in the manner marked below:

( ) SUBSTITUTE SERVICE: By serving _____ as _____

(X) CORPORATE SERVICE: By serving JOEL DOVICO as Registered Agent

( ) LIMITED LIABILITY COMPANY: By serving _____ as _____

( ) PUBLIC/GOVT AGENCY: By serving _____ as _____ of the within-named
agency.

( ) POSTED SERVICE: By attaching a true copy with the date and hour of service thereon by me, to a conspicuous place on the property
described herein.

( ) POSTED SERVICE: After attempting service on ___/___ at _____ and on ___/___ at _____ to a conspicuous place on the property described
herein.

( ) OTHER SERVICE: As described in the Comments below by serving _____ as

( ) NON SERVICE: For the reason detailed in the Comments below:

COMMENTS: R.A. for MSC Cruises USA Inc. Only
_____
_____

Age 40+ Sex (M)F Race White Height 5'9" Weight 180 Hair BROWN Glasses Y(N)

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.
Under penalties of perjury, I declare that I have read the foregoing Return of Service and that the facts stated in it are true. Notary Not Required
(F.S. 92.525).

PROCESS SERVER # CPS# 856 PBC
Appointed in accordance with State Statutes

**WAYNE Z. POLLICK**
**C.P.S. # 856 P.B.C.**

Pro Servers, Inc.
214 Apache Street
Tavernier, FL 33070
(305) 741-7761

Our Job Serial Number: 2021000663
Ref: CORTEZ MARITINEZ/ MSC CRUISES

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.0n

Filing # 129348025 E-Filed 06/24/2021 06:10:42 PM

IN THE CIRCUIT COURT OF THE
17ᵀᴴ JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 2021-CA-009008

DARWIN HUMBERTO CORTEZ MARTINEZ,

    Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

    Defendants.

_____/

Job # 0663
Date: 6/29/21   Time: 8·46 pu
Initials: WB   ID #: 856
Military: Y/N   Minested: Y/N

## ALIAS SUMMONS

TO:   **MSC Malta Seafarers Company Limited**
     **c/o Joel Dovico, Esq. – Registered Agent**
     **MSC Cruises (USA) Inc.**
     1.  **6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309; and/or**
     2.  **21659 Marigot Dr., Boca Raton, FL 33428; and/or**
     3.  **46ᵀᴴ SW Ave., Apt. 103, Pompano Beach, FL, 33069**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:   L. Alex Perez, Esq.
                        LIPCON, MARGULIES & WINKLEMAN, P.A.
                        One Biscayne Tower, Suite 1776
                        2 South Biscayne Boulevard
                        Miami, Florida 33131
                        Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

JUN 28 2021

CLERK                         DATE



(BY) DEPUTY CLERK

**BRENDA D. FORMAN**

## RETURN OF SERVICE


**ORIGINAL**

State of Florida

County of Broward

Circuit Court

Case Number: CACE-21-009008

Plaintiff:
**DARWIN HUMBERTO CORTEZ MARTINEZ**
vs.
Defendant:
**MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD**

EQE2021000661

For: L. Alex Perez, Esquire
Lipcon Margulies Alsina & Winkleman, P.A.

Received by Pro Servers, Inc. on the 28th day of June, 2021 at 10:30 am to be served on **MSC CRUISES S.A. CO c/o MSC CRUISES (USA) INC.** through its Registered Agent JOEL DOVICO, ESQUIRE, 21659 MARIGOT DRIVE, BOCA RATON, Palm Beach County, FL 33428. I, WAYNE Z. Pollick, do hereby affirm that on the __29__ day of __June__, 20_21_ at _8:45_ p.m., executed service by delivering a true copy of the Alias Civil Action Summons and Complaint And Demand For Jury Trial in accordance with state statutes in the manner marked below:

( ) SUBSTITUTE SERVICE: By serving _____ as _____.

(✓) CORPORATE SERVICE: By serving __JOEL DOVICO__ as __Esquire__

( ) LIMITED LIABILITY COMPANY: By serving _____ as _____

( ) PUBLIC/GOVT AGENCY: By serving _____ as _____ of the within-named agency.

( ) POSTED SERVICE: By attaching a true copy with the date and hour of service thereon by me, to a conspicuous place on the property described herein.

( ) POSTED SERVICE: After attempting service on __/__ at _____ and on __/__ at _____ to a conspicuous place on the property described herein.

( ) OTHER SERVICE: As described in the Comments below by serving _____ as _____

( ) NON SERVICE: For the reason detailed in the Comments below:

COMMENTS: __Not R.A.  Only Registered Agent for MSC Cruises USA, Inc.  Refused service Informed And Left Paper__

Age _40+_ Sex (M) F  Race _White_  Height _5'9"_  Weight _180_  Hair _Brown_  Glasses Y (N)

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made. Under penalties of perjury, I declare that I have read the foregoing Return of Service and that the facts stated in it are true. Notary Not Required (F.S. 92.525)

PROCESS SERVER # __CPS 856 PBC__
Appointed in accordance with State Statutes

**Pro Servers, Inc.**        **WAYNE Z. POLLICK**
214 Apache Street            C.P.S. # 856  P.B.C.
Tavernier, FL 33070
(305) 741-7761

Our Job Serial Number: 2021000661
Ref: CORTEZ MARITINEZ/ MSC CRUISES

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V6.0n

Filing # 129348025 E-Filed 06/24/2021 06:10:42 PM

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 2021-CA-009008

DARWIN HUMBERTO CORTEZ MARTINEZ,

    Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

    Defendants.

_____/

Job # 0661
L.... 6/29/21  Time: 8:45pm
In... W28   ID # 856
[illegible]

## ALIAS SUMMONS

TO:   MSC Cruises S.A. Co .
      c/o Joel Dovico, Esq. – Registered Agent
      MSC Cruises (USA) Inc.
      1.  6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309; and/or
      2.  21659 Marigot Dr., Boca Raton, FL 33428' and/or
      3.  46TH SW Ave., Apt. 103, Pompano Beach, FL, 33069

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:  L. Alex Perez, Esq.
                      LIPCON, MARGULIES & WINKLEMAN, P.A.
                      One Biscayne Tower, Suite 1776
                      2 South Biscayne Boulevard
                      Miami, Florida 33131
                      Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service
of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default
will be taken against you for the relief demanded in the complaint. You must also file your answer
with the Clerk of this Court within a reasonable period of time after service.



JUN 28 2021

CLERK

(BY) DEPUTY CLERK

**BRENDA D. FORMAN**

                            DATE

Filing # 129889635 E-Filed 07/01/2021 10:50:52 AM

## RETURN OF SERVICE

**State of Florida**                    **County of Broward**

Case Number: CACE-21-009008                                    Circuit Court

Plaintiff:
**DARWIN HUMBERTO CORTEZ MARITINEZ**
vs.
Defendant:
**MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD**

EQE2021000662

For: L. Alex Perez, Esquire
Lipcon Margulies Alsina & Winkleman, P.A.

Received by Pro Servers, Inc. on the 28th day of June, 2021 at 10:30 am to be served on MSC CRUISE MANAGEMENT (UK) LTD c/o MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE, 21659 MARIGOT DRIVE, BOCA RATON, Palm Beach County, FL 33428. I, _Wayne Z Pollick_, do hereby affirm that on the _29_ day of _June_, 20_21_ at _8:45_ p.m., executed service by delivering a true copy of the **Alias Civil Action Summons and Complaint And Demand For Jury Trial** in accordance with state statutes in the manner marked below:

( ) SUBSTITUTE SERVICE: By serving _____ as _____

(✓) CORPORATE SERVICE: By serving _Joel Dovico_ as _Esquire_

( ) LIMITED LIABILITY COMPANY: By serving _____ as _____

( ) PUBLIC/GOVT AGENCY: By serving _____ as _____ of the within-named agency.

( ) POSTED SERVICE: By attaching a true copy with the date and hour of service thereon by me, to a conspicuous place on the property described herein.

( ) POSTED SERVICE: After attempting service on ___/___ at _____ and on ___/___ at _____ to a conspicuous place on the property described herein.

( ) OTHER SERVICE: As described in the Comments below by serving _____ as

( ) NON SERVICE: For the reason detailed in the Comments below;

COMMENTS: _Not R.A.   Only Registered Agent for MSC Cruises USA, Inc._
_Refused service informed and left paper._

Age _40+_  Sex _M_ F  Race _White_  Height _5'9"_  Weight _180_  Hair _Brown_  Glasses Y (N)

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made. Under penalties of perjury, I declare that I have read the foregoing Return of Service and that the facts stated in it are true. Notary Not Required (F.S. 92.525).

PROCESS SERVER # _CPS# 856 PBC_
Appointed in accordance with State Statutes

**WAYNE Z. POLLICK**
**C.P.S. # 856  P.B.C.**

Pro Servers, Inc.
214 Apache Street
Tavernier, FL 33070
(305) 741-7761

Our Job Serial Number: 2021000662
Ref: CORTEZ MARITINEZ/ MSC CRUISES

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.0n

## RETURN OF SERVICE

**State of Florida**

**County of Broward**

Circuit Court

Case Number: CACE-21-009008

Plaintiff:
**DARWIN HUMBERTO CORTEZ MARITINEZ**
vs.
Defendant:
**MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD**

For: L. Alex Perez, Esquire
Lipcon Margulies Alsina & Winkleman, P.A.

EQE2021000662

Received by Pro Servers, Inc. on the 28th day of June, 2021 at 10:30 am to be served on MSC CRUISE MANAGEMENT (UK) LTD c/o MSC CRUISES (USA) INC. through its Registered Agent JOEL DOVICO, ESQUIRE, 21659 MARIGOT DRIVE, BOCA RATON, Palm Beach County, FL 33428. I, _Wayne Z Pollick_, do hereby affirm that on the _29_ day of _June_, 20 _21_ at _8:45_ pm, executed service by delivering a true copy of the Alias Civil Action Summons and Complaint And Demand For Jury Trial in accordance with state statutes in the manner marked below:

( ) SUBSTITUTE SERVICE: By serving _____ as _____.

(✗) CORPORATE SERVICE: By serving _Joel Dovico_ as _Esquire_

( ) LIMITED LIABILITY COMPANY: By serving _____ as _____.

( ) PUBLIC/GOVT AGENCY: By serving _____ as _____ of the within-named agency.

( ) POSTED SERVICE: By attaching a true copy with the date and hour of service thereon by me, to a conspicuous place on the property described herein.

( ) POSTED SERVICE: After attempting service on ___/___ at _____ and on ___/___ at _____ to a conspicuous place on the property described herein.

( ) OTHER SERVICE: As described in the Comments below by serving _____ as

( ) NON SERVICE: For the reason detailed in the Comments below:

COMMENTS: _Not R.A. Only Registered Agent for MSC Cruises USA, Inc. Refused Service informed and Left Paper._

Age _40+_ Sex (M)/F Race _White_ Height _5'9"_ Weight _180_ Hair _Brown_ Glasses Y/(N)

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made. Under penalties of perjury, I declare that I have read the foregoing Return of Service and that the facts stated in it are true. Notary Not Required (F.S. 92.525).

PROCESS SERVER # _CPS# 856 PBC_
Appointed in accordance with State Statutes

**WAYNE Z. POLLICK**
**C.P.S. # 856 P.B.C.**

Pro Servers, Inc.
214 Apache Street
Tavernier, FL 33070
(305) 741-7761

Our Job Serial Number: 2021000662
Ref: CORTEZ MARITINEZ/ MSC CRUISES

Filing # 129348025 E-Filed 06/24/2021 06:10:42 PM

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 2021-CA-009008

DARWIN HUMBERTO CORTEZ MARTINEZ,

    Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

    Defendants.

_____/

Job # 0662
Date: 6/29/21   Time: 8:45pm
Initials: WZP   ID #: 806
Military: Y/N   Married: Y/N

## ALIAS SUMMONS

TO:   **MSC Cruise Management (UK) LTD.**
      **c/o Joel Dovico, Esq. – Registered Agent**
      **MSC Cruises (USA) Inc.**
      1.  **6750 N. Andrews Ave, Suite 100, Fort Lauderdale, FL 33309; and/or**
      2.  **21659 Marigot Dr., Boca Raton, FL 33428' and/or**
      3.  **46TH SW Ave., Apt. 103, Pompano Beach, FL, 33069**

YOU ARE HEREBY SUMMONED and required to serve upon:

PLAINTIFF'S ATTORNEY:  L. Alex Perez, Esq.
                      LIPCON, MARGULIES & WINKLEMAN, P.A.
                      One Biscayne Tower, Suite 1776
                      2 South Biscayne Boulevard
                      Miami, Florida 33131
                      Tel. (305) 373-3016

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.



JUN 28 2021

CLERK

DATE

(BY) DEPUTY CLERK

**BRENDA D. FORMAN**

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 2021-CA-009008

DARWIN HUMBERTO CORTEZ MARTINEZ,

     Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

     Defendants.

_____/

## PLAINTIFF'S *EXPEDITIED* MOTION TO COMPEL MAINTEANCE AND CURE

    Plaintiff, DARWIN HUMBERTO CORTEZ MARTINEZ, by and through undersigned counsel, hereby moves the Court to compel Defendants to provide Plaintiff maintenance and cure, and in support thereof, states:

## INTRODUCTION

    1.  Plaintiff, DARWIN HUMBERTO CORTEZ MARTINEZ, worked for Defendants, MSC CRUISES S.A. CO., MSC MALTA SEAFARERS COMPANY LIMITED, and MSC CRUISE MANAGEMENT (UK) LTD., for approximately nine (9) years. Specifically, Plaintiff worked as a Cabin Steward for Defendants aboard their cruise ships. At all times material, Plaintiff held "seaman status" vis-à-vis Defendants and their fleet of vessels.

    2.  Plaintiff started working for Defendants when he was twenty-one (21) years old. When Plaintiff began working for Defendants, he was in excellent health. Plaintiff is now thirty-one (31) years old, and on the verge of death.

    3.  **Plaintiff will soon die if he does not immediately receive from Defendants maintenance and cure**. *See* <u>Dr. Lawrence Byrd Medical Report</u>, attached hereto as Exhibit 1.

4. Defendants are legally obligated to provide Plaintiff maintenance and cure under U.S. General Maritime Law and contract. *Costa Crociere, S.p.A. v. Rose*, 939 F.Supp. 1538 (S.D. Fla. 1996), attached hereto as Exhibit 2.

5. To date, Defendants have callously refused to provide Plaintiff the medical treatment he requires to sustain life and achieve Maximum Medical Improvement ("MMI").

## DEFENDANTS CAUSED PLAINTIFF'S INJURIES – AND NOW REFUSE TO PROVIDE HIM MAINTEANCE AND CURE

6. At all times material hereto, Plaintiff worked aboard Defendants' vessel, *MSC Poesia* ("the vessel") and held the status of a Jones Act Seaman.[1]

7. Between September and December 2019, Plaintiff presented to the medical center aboard Defendants' vessel on several different occasions with complaints of intense headaches. During that same time span, Defendants' shipboard medical personnel, including Defendants' shipboard doctors and nurses, examined Plaintiff and consistently documented the fact that Plaintiff was suffering from uncontrollable high blood pressure.

8. Despite Defendants' awareness of Plaintiff's consistent complaints of headaches and his consistently high and controllable blood pressure between September and December 2019, Defendants' shipboard medical personnel: i) failed to promptly and/or properly diagnose Plaintiff's underlying medical (*i.e.* kidney) condition; ii) failed to promptly and/or properly treat Plaintiff's underlying medical (*i.e.* kidney) condition; and iii) directly caused Plaintiff further medical injury by negligently prescribing Plaintiff medication contraindicated for, and which aggravated, his underlying medical (*i.e.* kidney) condition.

9. **These facts are supported by a Medical Report from Board-Certified Nephrologist Dr. Lawrence Byrd.** *See* Ex. 1, Dr. Lawrence Byrd Medical Report. Therein, Dr. Byrd explains:

   a. Plaintiff developed end-stage kidney failure because Defendants' shipboard care of Plaintiff was callously inept. Over a three-month period, Plaintiff had six encounters with Defendants' shipboard medical team in which his blood pressure was unacceptably high for a 29-year-old man. Defendants repeatedly diagnosed Plaintiff with "secondary hypertension," which should have triggered an immediate search for the underlying cause. Per Dr. Byrd, kidney disorders should have been at the top of that list for any physician in this situation. Simple tests like urinalysis and blood tests with kidney function such as creatinine and BUN would have

---

[1] Upon information and belief, Defendant, MSC CRUISES S.A. CO., owned the subject vessel; Defendant, MSC MALTA SEAFARERS COMPANY LIMITED, was one of Plaintiff's employers, along with the other named Defendants; and Defendant, MSC CRUISE MANAGEMENT (UK) LTD. controlled some operational aspects of the subject vessel.

revealed Plaintiff's underlying kidney issue, and these tests were available on the ship. Further, not only was Plaintiff treated in grossly incompetent and negligent fashion, but the treating physicians essentially poured gasoline on a burning fire: Plaintiff was treated with a nonsteroidal anti-inflammatory for no reason, which Defendants' medical team knew, or should have known, would further raise his blood pressure, counteract the effect of blood pressure medicines, and potentially damage Plaintiff's kidneys.

    i.  <u>For example</u>: On December 21, 2019, Plaintiff presented to Defendants with a headache and his blood pressure was 180/100 – a critically elevated reading. Defendants diagnosed Plaintiff with "hypertensive encephalopathy," implying that he was cognitively impaired, such as confused, disoriented, etc. However, Plaintiff's chart stated that he was alert, cooperative, and oriented to time, person, and place with a normal neurologic exam. Per Dr. Byrd, Plaintiff certainly did not have hypertensive encephalopathy. However, on the basis of this erroneous diagnosis, Plaintiff was then treated acutely with nifedipine 20 mg sublingually to lower his blood pressure. **That is a practice that has been known to be dangerous and has been strongly discouraged for about 35 years.** He was also prescribed nimesulide 100 mg, a drug Dr. Byrd has never seen utilized because it is banned in the U.S. and Europe because of a high risk of serious adverse effects.

b.  <u>Plaintiff has a poor prognosis if Defendants do not immediately provide him maintenance and cure</u>. When Plaintiff was medically disembarked from the vessel without a proper diagnosis as to his life-threatening kidney condition, he was immediately admitted to a shoreside hospital. On Christmas Day, December 25, 2019, Plaintiff was diagnosed with life-threatening hyperkalemia, with a potassium reading of 6.8 where normal is considered 3.5 to 5.0, and kidney failure (creatinine of 12.7 with normal up to 1.3). Plaintiff's blood pressure was 160 to 164 over 100 to 110. A hemodialysis catheter was inserted and he underwent hemodialysis to remove the toxins that his failed kidneys were not getting rid of. Per Dr. Byrd, life expectancy with end-stage kidney failure is dramatically shortened; a patient's life expectancy on dialysis is in the range of 5 to 10 years, on average. Without dialysis, Plaintiff would likely survive less than one month. As a result of his medical condition, Plaintiff now requires a variety of medications just to simply cling onto life – at a staggering cost that he cannot afford without financial/medical assistance from Defendants. Per Dr. Byrd, Plaintiff's best chance for survival and an improved quality of life is a kidney transplantation.

c.  <u>Plaintiff is unquestionably not at Maximum Medical Improvement ("MMI")</u>. Per Dr. Byrd, the fact that Plaintiff's condition of end-stage kidney disease is "chronic" is irrelevant; the relevant question to Dr. Byrd (and under the law, as explained in *Rose*, Ex. 2, and below) is whether further medical treatment can result in improvement of Plaintiff's medical condition. In Dr. Byrd's opinion, Plaintiff is unquestionably not at MMI: He can benefit from medications that improve anemia which is the result of kidney failure, medications to control blood pressure, and

- 3 -

L I P C O N ,   M A R G U L I E S   &   W I N K L E M A N ,   P . A .

medications to minimize cardiovascular-complications, which are the number one cause of death in patients with kidney failure. He can also benefit from further dialysis. Most importantly, however, Plaintiff can benefit from a kidney transplantation, which has the potential to transform Plaintiff's life qualitatively and quantitatively.

10. Under U.S. General Maritime Law and contract, Defendants have an obligation to ensure Plaintiff achieves MMI for his current kidney condition and related injuries. Plaintiff has not achieved MMI. **Plaintiff will soon die if he does not immediately receive from Defendants maintenance and cure.** *See* Ex. 1, <u>Dr. Lawrence Byrd Medical Report</u>.

## ARGUMENT AND INCORPORATED MEMORANDUM OF LAW

The case of *Costa Crociere, S.p.A. v. Rose*, 939 F.Supp. 1538 (S.D. Fla. 1996), attached hereto as Ex. 2, is instructive on the issues raised in this Motion, and Plaintiff's counsel urges the Court that it controls the outcome: Defendants must immediately provide Plaintiff maintenance and cure until he achieves MMI.

In *Rose*, a seaman developed a life-threatening kidney condition while working for his shipowner/employer. The issue in *Rose* was whether the seaman had achieved MMI for his kidney condition.

After outlining the purpose of the ancient maintenance and cure doctrine and its application to different types of chronic medical conditions, including the kidney issue at hand, *Rose* at 1547-58,[2] the Court held that the seaman in *Rose* **had not** achieved MMI; specifically because continued dialysis and/or a kidney transplant offered the seaman the possibility that his physical condition and function would improve, and thus, the defendant/employer had a continuing obligation to provide the seaman maintenance and cure:

> **The record establishes that dialysis and transplantation offer Rose a reasonable chance of continuing life for an indefinite period of time at a meaningful level of functioning. The record also establishes that, without these treatments, Rose faces certain and immediate death. The [shipowner/employer] cannot, under these facts and circumstances, meet their burden of proving that dialysis *and* transplantation do not offer a meaningful prospect of bettering Ewart Rose's condition.**
>
> **It is, therefore,**

---

[2] For purposes of brevity, Plaintiff adopts and incorporates by reference herein those principles. *See Costa Crociere, S.p.A. v. Rose*, 939 F.Supp. 1538 (S.D. Fla. 1996), attached hereto as Ex. 2.

**ORDERED AND ADJUDGED** that [Rose] has not reached the point of "maximum medical improvement" for purposes of the doctrine of maintenance and cure.

*Costa Crociere, S.p.A. v. Rose*, 939 F. Supp. 1538, 1558–59 (S.D. Fla. 1996) (emphasis added).

Plaintiff's case here is no different than the case in *Rose*. Plaintiff's case here is indistinguishable and the same result should follow: Based on Dr. Byrd's written report, Plaintiff is not at MMI because his kidney function and overall health would improve with continued dialysis and/or kidney transplant. As Defendants have a legal and contractual obligation to provide Plaintiff maintenance and cure until he achieves MMI, Defendants must provide Plaintiff the treatment outlined in Dr. Byrd's report until he achieves MMI.

**WHEREFORE**, Plaintiff, DARWIN HUMBERTO CORTEZ MARTINEZ, prays and respectfully urges the Court to compel Defendants to provide Plaintiff maintenance and cure until it is unequivocally determined by Plaintiff's treating medical professionals that he has achieved Maximum Medical Improvement.

Dated: July 2, 2021.

Respectfully submitted,

LIPCON, MARGULIES,
& WINKLEMAN, P.A.
*Attorneys for Plaintiff*
One Biscayne Tower, Suite 1776
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 373-3016
Facsimile: (305) 373-6204

By: */s/ L. Alex Perez*
**MICHAEL A. WINKLEMAN**
Florida Bar No. 36719
mwinkleman@lipcon.com
**JACQUELINE GARCELL**
Florida Bar No. 104358
jgarcell@lipcon.com
**L. ALEX PEREZ**
Florida Bar No.: 125452
aperez@lipcon.com

# Lawrence H. Byrd, M.D., F.A.C.P.

May 10, 2021

Alex Perez & Michael Winkleman
Lipcon, Margulies & Winkleman, P.A.
2 South Biscayne Boulevard, #1776
Miami, Florida 33131

Re:  Darwin Cortez

Dear Mr. Perez and Mr. Winkleman:

I reviewed the following medical records on Mr. Darwin Cortez
(Date of Birth:  9/3/90):

Review of Records

Pre-employment medical exam records/lab results; shipboard
medical records; and post-shipboard medical records/lab results.

Mr. Cortez was hired by MSC at age 21 and remained employed
there for about nine years.  His general health was excellent,
with no chronic conditions, no prescribed medications, and high
level of physical fitness with exercise five to six times per
week.  He aspired to a long career and job advancement, hoping
to build a better life for his family.  He joined the MSC Poesia
on 9/6/19, beginning what we believe to be his ninth contract
(crewmembers generally work on six-to eight-month contracts).
His pre-employment physical on 4/26/19 was unremarkable:  Normal
kidney function, normal urinalysis, normal BP of 110/70, and
normal blood sugar and hemoglobin.  Mr. Cortez sought medical
care, shipboard, on 9/16/19 because of an occipital headache (a
typical location for someone with high blood pressure).  His BP
was recorded at 180/100, extraordinarily high for a previously
healthy man of age 29.  Dr. Guifaro Martinez diagnosed him as
"secondary hypertension," stating that he had a history of
uncontrolled hypertension (clearly untrue).  The presumption of
secondary hypertension in a young patient should trigger a
search for the cause, but no diagnostic tests were ever ordered.
A bare minimum would have included urinalysis, creatinine, BUN,
and electrolytes, all easily available on a ship.  He was
prescribed enalapril 20 mg twice a day and furosemide 25 mg
daily and was discharged, "follow-up required."  However, no
effort was made to recheck his BP, and 26 days later on

Exhibit 1

Re:  Darwin Cortez
May 10, 2021
Page 2

10/22/19, he returned to clinic because of an injured right
index finger.  He was seen by Dr. Darko Radulovic and his BP was
recorded as 120/70, the only normal reading ever obtained while
on the ship and a dubious BP reading at that.  He returned as
requested the next day, about four weeks after the alarming
finding of a BP of 180/100.  Why was he asked to return one day
after a "normal" reading, when there had been no interest in his
response to two potent antihypertensive medications for nearly
one month?

On 10/23/19, he returned to clinic and his BP was recorded as
160/100.  Once again, the diagnosis was listed as secondary
hypertension and no diagnostic tests were deemed necessary.  For
reasons not articulated in the notes, he was given ketoprofen 80
mg daily for three days.  Ketoprofen is a nonsteroidal anti-
inflammatory agent known to raise BP and to potentially be toxic
to the kidneys.  The kidneys should have been the primary focus
of diagnostic testing in a young man with presumed secondary
hypertension, but no investigation was undertaken.  Atenolol 50
mg twice a day was added.

Mr. Cortez was next seen about two weeks later on 11/7/19 with
painful, frequent urination and his BP was 180/100.  He was
treated with an antibiotic, trimethoprim, for five days and once
again, inexplicably, no diagnostic tests were done.  There was
not even a urinalysis or urine culture, let alone a blood test.
The stated diagnoses were urinary tract infection and secondary
hypertension.  Valsartan 80 mg was prescribed in low dose, which
made very little sense.  It has a mechanism of action very much
like enalapril, but at this dose would clearly be inferior to
enalapril.  After that encounter with severely elevated BP and
the new medication added, no effort was made to recheck him in
timely fashion.  Instead, he returned about six weeks later when
follow-up should have occurred within 10 to 14 days.  That visit
on 12/18/19 demonstrated a BP of 160/100, still unacceptably
elevated.  He was again prescribed the initial drug choice of
enalapril 20 mg b.i.d., despite the apparent failure of that
drug earlier.  There was no mention of heartburn or other
gastrointestinal symptoms, yet he was given lansoprazole 30 mg
daily, which is a so-called PPI.  This class of drug has been
implicated as a potential cause of chronic kidney disease.  So,
he received a potential kidney toxin for no evident reason.

He returned to clinic the next day, 12/19/19, because of a
"strong headache."  The chart noted a "history of periodical

Exhibit 1

Re:  Darwin Cortez
May 10, 2021
Page 3

high blood pressure and periodical use of antihypertensive medication."  Just to be clear, his BP was severely elevated every time he was seen with that one dubious exception.  His elevated BP was anything but periodical, since it was sustained at very high levels.  Moreover, any periodical pattern of antihypertensive medication use was driven solely by the failure of medical staff to properly treat and continue treatment as well as monitor BP levels.  So, what was the next therapeutic step taken by medical staff?  He was now given captopril, an ACE inhibitor similar to enalapril, but even less likely to control BP because of grossly ineffective dosing of 25 mg daily for a drug that is meant to be dosed three times per day.  It also has an action essentially identical to enalapril, which in a much higher, more effective dosage did not lower BP.  His blood pressure at that time was 180/110 again!

He returned two days later on 12/21/19 with a headache and BP was 180/100.  He was diagnosed with "hypertensive encephalopathy," implying that he was cognitively impaired, such as confused, disoriented, etc.  However, the chart states that he was alert, cooperative, and oriented to time, person, and place with a normal neurologic exam.  So, he certainly did not have hypertensive encephalopathy.  He was then treated acutely with nifedipine 20 mg sublingually to lower BP.  That is a practice that has been known to be dangerous and has been strongly discouraged for about 35 years.  He was also prescribed nimesulide 100 mg, a drug I have never seen utilized.  It is banned in the U.S. and Europe because of a high risk of serious adverse effects.  His seventh and last visit was on 12/23/19, when he was given another BP medication, Micardis 40 mg and amlodipine 5 mg, and was deemed "unfit to work" and "fit to fly."  He was instructed to return to his hometown for further evaluation and treatment.  A shoreside specialist, Dr. Fernardo Edelberg, stopped furosemide and suggested "complete studies of kidneys."

He was then admitted to Hospital Centro Medico Sonsonate with nausea, vomiting, and diarrhea on Christmas day, 12/25/19.  He had severe hyponatremia with a serum sodium of 117 with normal being 135 to 145 and life-threatening hyperkalemia, with a potassium of 6.8 where normal is considered 3.5 to 5.0, and kidney failure (creatinine of 12.7 with normal up to 1.3).  His BP was 160 to 164 over 100 to 110.  A hemodialysis catheter was inserted and he underwent hemodialysis to remove the toxins that his failed kidneys were not getting rid of.  I have not been

Exhibit 1

Re:  Darwin Cortez
May 10, 2021
Page 4

able to review medical records since that time, but have been
informed that he remains in end-stage kidney failure, dialysis
dependent.  His type of dialysis was changed at some point from
hemodialysis to peritoneal dialysis, which is done seven days
per week.

Discussion and Conclusion

I shall now address four important issues regarding this case
(Cortez versus MSC).

First problem, with respect to causation:  He developed end-
stage kidney failure because his shipboard medical care was
callously inept, lacking in the most basic principles known to
most second-year medical students.  He had seven clinic visits,
all but one exhibiting totally unacceptable BP readings for any
age, let alone a healthy 29-year-old.  The response was brief,
poorly conceived treatment, with a total lack of follow-up for
an employee working no more than five-minute walk away from that
clinic.  To make matters worse, he was repeatedly diagnosed with
"secondary hypertension," which should have triggered an
immediate search for a cause.  Kidney disorders should have been
at the top of that list for any physician in this situation.
Simple tests like urinalysis and blood tests with kidney
function such as creatinine and BUN would have revealed the
problem.  However, seven visits later, the most rudimentary of
investigations had never been undertaken, nothing at all.  Not
only was he treated in grossly incompetent and negligent
fashion, but the treating physicians essentially poured gasoline
on a burning fire.  He was treated with a nonsteroidal anti-
inflammatory for no reason, which they knew, or should have
known, would further raise his BP, counteract the effect of
blood pressure medicines, and potentially damage his kidneys.
He was similarly treated with a PPI drug, which is known to
potentially hurt the kidneys, and again there was no discernible
reason to have prescribed it.  When the physicians became more
desperate, the treating shipboard doctors misdiagnosed him as
"hypertensive encephalopathy," then treated him with two totally
inappropriate medications (nifedipine 20 mg sublingual and
nimesulide).  There simply is no justification whatsoever and no
amount of rationalization to explain the many, multilayered
errors of omission and commission in this case.  The outcome was
not inevitable:  It was avoidable with even a minimum of
adequate medical care.

Exhibit 1

Re:  Darwin Cortez
May 10, 2021
Page 5

The second issue to be addressed is Mr. Cortez's prognosis.
Life expectancy with end-stage kidney failure is dramatically
shortened.   His life expectancy on dialysis is likely in the
range of 5 to 10 years, on average.  His best chance for
survival and an improved quality of life is kidney
transplantation.   However, he will face several obstacles,
including shortage of kidneys, a long wait list for transplant
(often three to five years), medical clearance by a transplant
team, and a huge financial burden.

The third issue is that of necessary treatment.  Without
dialysis, Mr. Cortez would likely survive less than one month.
In addition, a variety of medications is needed:  The average
dialysis patient takes 19 pills per day, at a staggering cost.
Ideally, every young patient should receive a kidney transplant,
but significant obstacles exist as noted above.

The fourth issue is MMI:  Is Mr. Cortez at maximum medical
improvement?  The fact that his condition of end-stage kidney
disease is "chronic" is irrelevant.  What matters here is
whether treatment can result in improvement of his medical
condition.  In my opinion, he is unquestionably not at MMI.  He
can benefit from medications that improve anemia which is the
result of kidney failure, medications to control blood pressure,
and medications to minimize cardiovascular complications, which
are the number one cause of death in patients with kidney
failure.  Most importantly, kidney transplantation has the
potential to transform his life, qualitatively and
quantitatively:  I have patients who have received a kidney
transplant more than 35 years ago and are alive today, fully
enjoying retirement and grandchildren.  That is highly unlikely
for anyone in Mr. Cortez's situation.

The sad truth in this case is that Mr. Cortez finds himself in
this unenviable situation directly because of gross negligence,
incompetence, and callous disregard for his well-being on the
part of the medical staff aboard the ship, Poesia.  No effort
whatsoever was ever made to search for the cause of his
hypertension.  The term secondary hypertension alone should have
signaled the need to investigate, using even simple tests easily
available on a ship.  He was examined seven times and never once
was something as simple as a urine or blood test ordered.  The
choices of medication were haphazard, ill conceived, and totally
failed to control his blood pressure as it destroyed his
kidneys.  To make matters worse, they chose to give him

Exhibit 1

Re:  Darwin Cortez
May 10, 2021
Page 6


medicines toxic to the kidneys for no obvious reason, including
NSAIDs particularly.  Mr. Cortez was severely and permanently
injured by these errors of omission and commission.
Hypertension is the second leading cause of kidney failure after
diabetes, resulting in about one-quarter of the cases of end-
stage kidney failure.  The tragedy in this case is that this was
all avoidable and not at all inevitable.  The medical staff had
so many opportunities to effectively intervene, and never did
they do so.

If I can be of further assistance to you regarding this matter,
please feel free to contact me.

Sincerely yours,



LAWRENCE H. BYRD, M.D., F.A.C.P.
Clinical Assistant Professor of Medicine
Rutgers Medical School

LHB:etran/sc

Exhibit 1

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

939 F.Supp. 1538
United States District Court,
S.D. Florida.

COSTA CROCIERE, S.p.A., a foreign
corporation, and Family Hotel Services,
Inc., a foreign corporation, Plaintiffs,

v.

Ewart C. ROSE, Defendant.

No. 95–377–Civ–Marcus.
|
July 15, 1996.

### Synopsis

Shipowner and corporation which employed seaman filed complaint seeking declaration that their obligation to provide maintenance and cure to seaman diagnosed with incurable kidney disease ended when seaman was stabilized on dialysis after being transferred from ship to hospital on shore. The District Court, Marcus, J., held that seaman had not reached maximum medical improvement, since continued dialysis or kidney transplant offered possibility of betterment in seaman's physical "condition," and thus obligation to provide maintenance and cure continued.

So ordered.

### West Headnotes (12)

[1]     **Seamen** ⟵ Medical Treatment and
        Maintenance of Disabled Seamen

        Ambiguities or doubts in application of law of maintenance and cure are resolved in favor of seamen; if leeway is to be given in either direction, all considerations which brought doctrine of maintenance and cure into being dictate that it should be applied on sailor's behalf.

[2]     **Seamen** ⟵ Medical Treatment and
        Maintenance of Disabled Seamen
        **Seamen** ⟵ Extent and Duration of Liability

        "Maintenance" is a per diem subsistence allowance designed to provide seaman with compensation sufficient to cover his food and lodging until the time of maximum medical improvement; it is designed to encompass the reasonable cost of food and lodging comparable to that received aboard the vessel; "cure" represents the cost of medical and nursing care during the seaman's affliction, again until the point of maximum improvement.

        2 Cases that cite this headnote

[3]     **Seamen** ⟵ Medical Treatment and
        Maintenance of Disabled Seamen

        Right to maintenance and cure springs from seaman's dependence on his ship, and does not turn on fault of shipowner or seaworthiness of the vessel.

        3 Cases that cite this headnote

[4]     **Seamen** ⟵ Medical Treatment and
        Maintenance of Disabled Seamen

        Cause of seaman's ailment is irrelevant to right to maintenance and cure, so long as ailment manifests itself while seaman is in service of his vessel.

        2 Cases that cite this headnote

[5]     **Seamen** ⟵ Actions

        Burden of proving right to maintenance and cure rests with seaman.

        4 Cases that cite this headnote

[6]     **Seamen** ⟵ Actions

        Once seaman establishes his right to maintenance and cure, burden of persuasion shifts to shipowner to prove that seaman has reached point of maximum medical improvement, precluding further obligation to provide maintenance and cure.

        12 Cases that cite this headnote

⟪WESTLAW⟫

Exhibit 2

**Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)**
1996 A.M.C. 2797

**[7]   Seamen ⟜ Extent and Duration of Liability**
Seaman's entitlement to maintenance and cure continues to the point of "maximum medical improvement," when there is no possibility of betterment in the seaman's physical "condition"; point of maximum medical improvement is not reached when seaman's underlying disease is established to be incurable, when further improvement in seaman's "condition" is possible.

9 Cases that cite this headnote

**[8]   Seamen ⟜ Extent and Duration of Liability**
When available treatment leaves seaman feeling better without enhancing his bodily function and moving him to an improved state of health, then point of "maximum medical improvement" has been reached, and shipowner's liability for maintenance and cure may be extinguished.

3 Cases that cite this headnote

**[9]   Seamen ⟜ Extent and Duration of Liability**
Seaman diagnosed with incurable kidney disease had not reached point of maximum medical improvement, where record established that appropriate treatment, in form of dialysis or kidney transplant would result in betterment of seaman's medical condition, and thus shipowner's obligation to pay maintenance and cure was not extinguished.

9 Cases that cite this headnote

**[10]   Seamen ⟜ Actions**
In some if not all contexts, it is shipowner's burden to establish that a particular treatment is overly expensive or unnecessary, relieving shipowner of maintenance and cure obligation with respect to that treatment.

**[11]   Seamen ⟜ Extent and Duration of Liability**
Probability of betterment in seaman's condition as a result of kidney transplant was sufficient

to bring such treatment within maintenance and cure obligation.

1 Cases that cite this headnote

**[12]   Seamen ⟜ Extent and Duration of Liability**
Shipowner's obligation to provide maintenance and cure is not extinguished due to financial burden of the undertaking or length of time it is needed to effect a betterment of seaman's condition.

**Attorneys and Law Firms**

*1539 Michael T. Moore, Holland & Knight, Miami, FL, for plaintiffs.

Stephen A. Papy, Miami, FL., Joel C. Cronin, Romano, Eriksen & Cronin, P.A., West Palm Beach, FL., for defendant.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

MARCUS, District Judge.

THIS CAUSE was tried before the Court without a jury on the issue of maintenance and cure and the specific question of whether the Defendant has reached the point of maximum medical improvement. Evidence was presented on November 27 and 28, 1995 and closing arguments were heard on December 11, 1995.

The Plaintiffs filed their single-count complaint on February 24, 1995, seeking a declaration that the Defendant has reached the point of maximum medical improvement, and that therefore the Plaintiffs have no continuing obligation to provide him with maintenance and cure. The Defendant filed an answer and counterclaim on April 26, 1995.[1] The original counterclaim contains three counts. Count 1 seeks relief for Jones Act negligence and failure to provide prompt and adequate medical care. Count II seeks relief under the common law doctrine of unseaworthiness. Count III seeks relief for the Plaintiffs' alleged failure to provide maintenance and cure. In an Order dated June 30, 1995, the Court bifurcated this lawsuit, setting one series of pre-trial dates for Defendant's Jones Act and unseaworthiness claims, and another set of dates for issues relating to maintenance and

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

cure. At a pre-trial conference on November 7, 1995, the parties agreed that maintenance and cure would be **\*1540** tried to the Court, upon the understanding that the Plaintiffs could reserve their right to raise affirmative defenses to Rose's continued entitlement to maintenance and cure at the time of a jury trial on the Jones Act and unseaworthiness claims.

1

On May 17, 1996, the Court granted the Defendant's motion for leave to add two additional parties to this counterclaim: Premier Cruise Lines Ltd., Inc. and Stellar Maritime Services, Inc. On June 20, 1996, Premier filed a third party complaint against Dr. Charles Wanich. We emphasize that neither Premier Cruise Lines, Stellar Maritime Services nor Dr. Wanich participated in the bench trial, and therefore are not estopped from re-litigating the findings of fact and conclusions of law detailed in this Order. *Cf. Mike Smith Pontiac v. Mercedes-Benz of North America, Inc.,* 32 F.3d 528, 532 (11th Cir.1994) (identifying the requirements for collateral estoppel and stressing that "the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding").

After a thorough review of the evidence and materials presented at trial, and having considered the memoranda and argument of counsel, we conclude that the Defendant has not reached the point of "maximum medical improvement" as defined in the case law of this Circuit, and that therefore the Plaintiffs must continue to provide maintenance and cure. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

1. The Defendant, Ewart C. Rose, is a black, 35–year–old citizen of Jamaica and a resident alien in the United States. He resides and is domiciled in Miami, Florida. At all times material to this lawsuit, Rose was a seaman and "in the service of the vessel."

2. Plaintiff Costa Crociere, S.p.A. ("Costa") is the owner and operator of the vessel M/V American Adventure. Plaintiff Family Hotel Services, Inc. ("FHS") employed Rose while he served aboard the M/V American Adventure, from some time in early February of 1994 until June 21, 1994, when he was transferred off the vessel for medical care and treatment.

3. In February of 1987, Rose, at that time a seaman aboard a ship purportedly operated by Premier Cruise Lines, Ltd., was referred by the ship's doctor to Dr. Jonathan Gayden, a physician based in Melbourne, Florida and specializing in internal medicine. Gayden evaluated Rose on or about February 23, 1987, and found, among other things, that the Defendant suffered from hypertension and a urinary infection. Gayden prescribed separate medications for the hypertension and the infection. Rose returned for a second visit in March, 1987, at which time Gayden discovered blood in Rose's urine. During a third visit in April, 1987, Rose complained of left flank pain. Gayden then referred Rose to Dr. Wanich, who conducted a kidney biopsy.

4. In May, 1987, Dr. Gary Pearl interpreted the biopsy and prepared a report summarizing his findings. *See* P'tiff. exh. 49. Pearl, an Orlando, Florida-based specialist who is board certified in anatomic pathology, clinical pathology and neuropathology, diagnosed Rose as suffering from IgA nephropathy, a renal disease associated with excessive immune deposits, a component of which is immunoglobulin A.

5. IgA nephropathy is an incurable kidney disease. The exact cause of the disease, which may result in a total loss of renal function, is unknown.

6. Defendant's expert, Dr. Alan Arieff, testified that he believed Pearl's diagnosis was incorrect. Arieff, a nephrologist and professor of medicine at the University of California School of Medicine in San Francisco, is board certified in internal medicine and nephrology and is associated with the University's transplant, dialysis and renal disease programs. Arieff based his opinion on a review of the findings summarized in Pearl's report. He testified that while some of Pearl's findings were consistent with a diagnosis of IgA nephropathy, other findings suggested that Rose was suffering from malignant hypertension.[2] Unlike Pearl, however, Arieff did not examine the kidney tissue removed during the biopsy or review pictures or slides of the tissue. The Court therefore finds, for purposes of this Order, that while malignant hypertension may have contributed to Rose's current condition, the predominant cause is IgA nephropathy.

2

Arieff suggested that, unlike IgA nephropathy, malignant hypertension may be cured through appropriate drug therapies. He added that malignant hypertension leads to total renal failure in about 20 percent of the cases.

Exhibit 2

**Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)**
1996 A.M.C. 2797

7. On or about June 21, 1994, while serving as a crew member on the M/V American Adventure, Rose suddenly became ill, and was removed from the ship for emergency medical care. He was airlifted to the Dominican Republic, and from there to Miami, Florida, where he was admitted to Cedars Medical Center and stabilized.

**\*1541**  8. Dr. Luis Garcia–Mayol examined Rose upon his arrival at Cedars, and remains the Defendant's primary treating physician. Garcia–Mayol described himself as a consultant on nephropathy and internal medicine who spends 50 percent of his time with kidney dialysis patients. He testified that his examination of Rose revealed that the Defendant had suffered a total renal failure along with acute high blood pressure. Rose was immediately placed on kidney dialysis. Since then, Rose has received dialysis treatments three times a week at the Flamingo Park Kidney Center in Miami.

9. In November, 1994, Garcia–Mayol referred Rose to Dr. Joshua Miller, co-director of the Division of Transplantation, Department of Surgery at the University of Miami. Dr. Miller screened Rose in order to determine his appropriateness as a candidate for a kidney transplant. Miller concluded that Rose was a viable transplant candidate.[3] Rose's brother has volunteered to donate his kidney for the operation.

3      *See also* F. of F. at 25. Miller did not testify at trial, either live or by deposition.

10. Garcia–Mayol stated that, notwithstanding the dialysis treatments, Rose presently suffers from high blood pressure, softened bones, peripheral nerve difficulties and severe walking disabilities, all of which are attributable to his kidney disease. Garcia–Mayol testified that Rose has chronic renal failure, and that his condition has been degenerating over the past twelve months.

11. The Plaintiffs' principal expert was Dr. David Roth, a nephrologist specializing in transplantation at the University of Miami School of Medicine. Roth is medical director of the School's transplant program, working exclusively with kidneys.

12. Roth described the nature of IgA nephropathy. He explained that it is a progressive disease, in the sense that it triggers a process that results in gradual damage to the kidney, leading to an eventual loss of kidney function. He testified that no method of retarding the advance of the disease

has been recognized as the standard of care, although a number of experimental drug trials have shown promise. For the moment, according to Roth, the most important factor in retarding the disease is control of hypertension, because elevations in blood pressure aggravate the condition and speed the progressive loss of kidney function.

13. Roth testified that when renal failure occurs, the body is unable to prevent the accumulation of toxins and other fluids. Without treatment on dialysis, or a kidney transplant, a patient with total renal failure will die within no more than a matter of weeks. The parties have stipulated that, without dialysis or a transplant, Rose will die. When asked by Defendant's counsel whether Rose would have to receive dialysis or a transplant in order to expect maximum improvement in his condition, Roth answered "Okay. Fine."

14. As noted above, the Defendant currently is receiving dialysis treatments. Roth explained that the purpose of dialysis is to remove from the body the toxins that otherwise would be eliminated by a functioning kidney. He testified, and we find, that a patient receiving dialysis shows a measurable improvement from the standpoint of body chemistry and overall well-being. The patient's blood will show a more moderate level of abnormalities, and cardiac function is enhanced. Roth explained that this improvement is most dramatic when the very ill begin to receive dialysis, but even those less critically ill report a better appetite and more energy over a period of weeks. He added that it is unclear how much, if any, measurable deterioration takes place between individual dialysis sessions.

15. Both Roth and Arieff testified, and the Court finds, that a patient can be maintained on dialysis for a significant period of time. Arieff estimated that a patient can live 10–20 years. Roth explained that a dialysis patient has a "reasonable life expectancy."

16. The alternative to continued dialysis is a transplant. Roth said the suitability of a patient for transplant is determined by reference to a multitude of variables. These variables include: (1) the patient's cardiac function and history of cardiac disease, if any; (2) other co-morbid factors, such as vascular disease, malignancy, high blood pressure and **\*1542**  prior strokes; (3) the results of a psychological interview, with particular emphasis on the likelihood of the patient's compliance with necessary post-operative treatments; and (4) the presence of infections such as HIV. Roth testified that he does not rely on statistical

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

probabilities of success in evaluating specific patients, and does not inform potential candidates of these probabilities unless they ask. He explained that another factor concerns how well the patient is performing on dialysis. If the patient is performing well, and leading a relatively normal lifestyle, then the risks of a transplant might outweigh the gains. Conversely, if the patient is faring poorly because his body cannot tolerate the process, or because he has limited access to dialysis treatment facilities, transplant becomes a more necessary option.

17. The parties' experts disagreed on whether one of the advantages of a transplant over long-term dialysis is increased longevity of life. Arieff testified that he perceives increased longevity as one of the advantages of a transplant. Roth, by contrast, testified that he informs patients that the benefits of a transplant are marked, but essentially center on quality of life rather than extension of life, since the efficacy of the transplant cannot be guaranteed and the data is not strong enough for him to advise patients that they will survive longer if they opt for a transplant. Roth opined that, based on his own experience and his assessment of the literature, transplantation offers individuals a far better chance of returning to normal life activities. He testified that while the majority of dialysis patients are unable to return to work, the rehabilitation rate for successful transplant recipients is much higher. Roth's views are reflected in the publication "Getting Ready for a Transplant," authored by the National Kidney Foundation. *See* P'tiff. exh. 78A. The pamphlet explains that "[k]idney transplantation is accepted as the preferred treatment for many people with kidney failure. Transplantation has many advantages such as a lifestyle free from dialysis and fewer fluid and dietary restrictions. Kidney transplant, when successful, can often provide a better quality of life for the many of people." For these reasons, Roth described himself as having a pro-transplant bias, although he acknowledged that a transplant is not suitable for all patients with end stage renal failure.

18. Roth testified that transplantation carries a certain degree of risk. Some of these risks are those normally attendant to major surgery. Other risks, however, relate to the patient's reaction to the immunosuppressive medications that are administered to prevent the body from rejecting the new kidney and to ensure its smooth functioning. Among the possible side effects of these drugs are (1) susceptibility to severe infections such a pneumonia; (2) malignancies; (3) cataract formation; (4) bone disease; (5) worsened hypertension; and (6) increased cholesterol and lipid abnormalities. Moreover, according to Roth, if the patient's body rejects the new kidney, the body pays a price that worsens the likelihood that a resumption of dialysis will sustain life for a meaningful period of time.

19. Roth testified that transplantation does not eliminate the underlying cause of the kidney failure. He explained that a disease such as IgA nephropathy may affect the new kidney in 20–60 percent of cases, although it is relatively uncommon for the new kidney to fail as a result of the disease. He added that while a transplant will help mitigate the condition of the disease, it will not remove all traces of the disease from the patient's body.

20. Despite their differing views on the efficacy of transplantation as a life-saving treatment, both experts agreed, and we find, that the successful recipient of a transplant often will show objectively verifiable improvement over a similarly situated patient on chronic dialysis. Roth explained that a properly functioning new kidney will do a superior job of removing toxins and excess fluids than dialysis, thereby creating a better chemical balance in the body and making the patient, on balance, "healthier" than before. In addition, a healthy kidney produces hormones that increase the number of red blood cells, and helps to stabilize blood pressure **\*1543** levels and correct anemia.[4] Arieff testified that a transplant, unlike dialysis, also will (1) arrest the progressive decline in the patient's IQ; (2) improve the patient's peripheral nerve system, making muscles stronger, providing more energy and reducing the likelihood of impotence; (3) arrest the deterioration of the patient's bones; (4) improve the condition and appearance of the patient's skin; and (5) help reduce the intermittent weight gain often associated with dialysis.

[4]    Roth noted, however, that a dialysis patient can be given drugs to increase hormone production to a level almost commensurate with that of a new kidney.

21. Roth testified that the three most important factors in determining the likelihood of a successful transplant are (1) whether the kidney to be transplanted is a matched (preferably H.L.A. identical) kidney from a living related donor, rather than a kidney from a cadaver; (2) the race of the patient; and (3) the patient's compliance with post-operative directions with regard to treatment and the taking of immunosuppressants and other anti-rejection drugs.

22. In assessing the statistical probabilities for survival of transplant candidates like Rose, both Roth and Arieff referred to data from the United States Renal Data System

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

("USRDS"). According to Roth, the data summarized in the Report is based on results for Medicare eligible dialysis patients for which the United States receives information through the Social Security system. The tables list the survival probabilities for each year between 1977 and 1987 for dialysis patients and patients receiving kidney transplants, adjusted for age, race, gender or the primary disease causing end stage renal disease. On their face, the tables do not attempt to adjust the survival probabilities for more than one factor at a time. Figures of this sort may be determined by relying on familiar tools of statistical analysis.

Referring to the July, 1994 USRDS Report, *see* P'tiff. exh. 99A–D, Arieff stated that a black male in the 35–39 year age group suffering from malignant hypertension would have a five-year survival rate of 30 percent, and a ten-year survival rate of 11 percent, if he continued on dialysis. He then stated that a black male in the 35–39 age group suffering from malignant hypertension would have a five-year survival rate of 79 percent, and a ten year survival rate of 49 percent, if he received a transplant from a living related donor. As noted above, Arieff testified that he believed the principal cause of Rose's end stage renal failure was malignant hypertension rather than IgA nephropathy. He stressed, however, that the USRDS survival rates are higher, not lower, if the cause of the renal failure is a disease like IgA nephropathy. Unlike Arieff, Roth did not consult the USRDS Report during his live testimony. When questioned by counsel, he agreed that the statistics indicate Rose can be expected to live 7 ½–to–8 years on dialysis. He also agreed that the statistics show a roughly 40 percent five-year survival rate for 35–40 year old black males with a disease like IgA nephropathy on dialysis.[5] Roth added that these survivability figures would be higher for patients with no co-morbid factors.

[5]   Roth stated that results at the University of Miami are better than those contained in the USRDS Report for a 30–40 year old black male receiving a transplant.

Drawing on studies performed in part at the University of Miami's transplant center, Roth estimated that less than 50 percent of blacks receiving a transplant (whether living related or cadaveric) will survive ten years. Roth also estimated that a H.L.A. matched kidney transplanted into someone with Rose's demographics would have an 80 percent chance of functioning for five years, and roughly a 70 percent chance of functioning for ten years.

Roth suggested, and Arieff eventually conceded, that all of these statistical probability figures should be used with caution. Roth stated that the USRDS figures are not reliable, because although the data can be correlated for age, sex, race, disease and modality of treatment, it nevertheless fails to take into account other co-morbid factors (such as compliance, cardiac function and the existence of prior, failed transplants for those patients on dialysis) which have a tremendous impact on the success of treatments for end stage renal failure. Roth again emphasized that he does not like to use statistics, **\*1544** because the data does not take sufficient account of the unique features of the current health and background of individual patients. Arieff acknowledged that the USRDS Report itself advises that "[g]iven the likely selection bias involved in the selection of patients into modalities, patient characteristics may vary substantially between modality groups. Therefore, differences in survival across modality groups may not necessarily be ascribable to differences in the efficacy of treatment modalities, even after the adjustments for age, race, sex and primary disease." *See* P'tiff. exh. 99E. In addition, Roth noted that the USRDS data is somewhat aged, and does not fully take into account recent advances in dialysis technology that make it more effective as a life-sustaining treatment.

Roth was questioned about the results of a 1985 Canadian study that attempted to document the connection between race and treatment modalities for end stage renal failure patients —the "Hutchinson article." The study tracked the five-year survival rate of three groups of patients: those on dialysis, those receiving cadaveric transplants and those receiving living related donor transplants. It did not, however, take into account co-morbid conditions and other pre-treatment differences among patients. Roth testified that, according to the study, the dialysis population statistically underperformed the transplant population, but the survival rate for living related donor patients, while higher, at 90 percent, than that for cadaveric patients, 80 percent, was not statistically significant. He explained, however, that when the patient populations are tailored to take into account co-morbid factors and pre-treatment differences, the studies indicate that the survival rates for dialysis patients and patients receiving cadaveric transplants converge. Roth acknowledged that the Hutchinson data was compiled prior to the introduction of more powerful immunosuppressants such as Cyclosporin. He agreed that more recent data indicates that these drugs have resulted in up to an 8 percent increase in graft survival rates at the five year point, but noted that relative long-term survival rates have not changed a great deal.

WESTLAW

Exhibit 2

**Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)**
1996 A.M.C. 2797

23. As noted above, both Roth and Arieff testified that race is a factor that affects the survivability of patients receiving transplants as a therapy for end stage renal failure.[6] Roth, who has co-authored a study on the link between race and renal transplantation, explained that blacks receiving a transplant tend to perform worse than similarly situated whites, and that being of African descent has a "significant and striking" negative effect on the outcome of transplantation. Thus, while H.L.A. identical living related donor kidneys transplanted into a black patient have a half-life of 10–15 years, a H.L.A. identical living related donor kidney transplanted into a white patient has a half-life of up to 25 years.[7] Roth also explained that the overall difference in graft failure rates between whites and blacks is dramatic, and falls in the neighborhood of 15–25 percent at the five and ten year points. He added that the immunosuppressant drugs needed to prevent rejection seem to have less of a positive effect on blacks, although the solution might be to provide the drugs in higher doses. He noted that non-compliance, whether as a result of inadequate access and funding or otherwise, is another factor that contributes to the relatively higher graft failure rate.

[6]   At one point in his testimony, Roth described as incorrect the statement of Plaintiffs' counsel that blacks do not do as well as whites on dialysis. Roth stated that "[t]he experience with black or Afro–American individuals on dialysis in the country has been actually somewhat better than that of Caucasian descent." At a subsequent point, Roth stated that he was not able to give a meaningful medical opinion on the relative survivability rates of blacks on dialysis and blacks receiving transplants.

[7]   "Half-life" refers to the point at which one half of all transplanted kidneys have failed.

Roth was questioned about the findings of the Hutchinson article and other studies with respect to the relative performance of blacks and whites who receive H.L.A. identical living related donor kidneys. Roth testified that whites receiving H.L.A. identical living related donor kidneys show a better five-year survival rate than similarly situated blacks, whose five-year survival rate approximates that for whites receiving cadaveric transplants. **\*1545** Roth added that blacks receiving cadaveric transplants underperform whites receiving cadaveric transplants. He emphasized, however, that blacks, like whites, show a higher survival rate when given a matched living related donor kidney than they do when given a cadaveric kidney. For this reason, according to Roth, he encourages blacks to find living related donors.

Nevertheless, Roth testified that he does not take race into consideration when evaluating the suitability of a patient for transplant. Roth also testified that while some studies indicate that blacks receiving H.L.A. identical grafts run a higher risk of IgA nephropathy impairing the new kidney than do similarly situated whites, he does not feel that the evidence is strong enough to caution against H.L.A. identical grafts for blacks suffering from the disease.

24. Roth estimated that the overall cost of a kidney transplant, including the post-operative administration of anti-rejection drugs, drops below that of chronic dialysis at the three year point. During his cross-examination of Roth, counsel for the Defendant referred to a April 28, 1995 letter from Dr. Miller to Dr. Garcia–Mayol suggesting that a kidney transplant becomes more cost-effective than dialysis in as little as a year. Roth did not agree with this estimate. Arieff, like Roth, described the break-even point as roughly three years. We credit the testimony of these experts. For purposes of comparison, Arieff estimated that dialysis costs, on average, $60,000–70,000 a year, while the first three years following a successful transplant cost $200,000. The National Kidney Foundation's "Getting Ready for a Transplant" states that a kidney transplant "is less expensive [than dialysis] in the long-run." *See* P'tiff. exh. 78A.

25. As noted above, Dr. Miller recommended Rose as a viable candidate for a kidney transplant. *See* F. of F. at 9. When asked about Rose's viability as a candidate for transplant, Roth noted that while he has seen Miller's report, he has not interviewed or examined the Defendant. Roth did note that Rose's history of significant hypertension and his African descent are factors that weigh against a successful transplantation. He also indicated his concern about the possibility of Rose's non-compliance with post-operative treatments, a concern borne of his impression that Rose may not have been taking the hypertension medicine prescribed for him after his consultations with Gayden, Wanich and Pearl in 1987. Nevertheless, Roth testified that Miller presumably conducted all of the standard evaluations given to transplant candidates at the University of Miami. Roth added that Miller presumably was aware of the aforementioned concerns about the Defendant when he recommended him as a candidate for transplant. Roth further explained, and we find, that the fact Rose will receive a H.L.A. matched living related donor kidney from his brother is strongly in his favor. Roth added that he could not say with a reasonable degree of medical certainty whether Rose would live longer with a transplant than on chronic dialysis, because he has not interviewed or

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

evaluated Rose in person, and is not familiar with how well he has performed on dialysis. Arieff, for his part, testified that it was more likely than not that Rose would live longer if a transplant is performed.

26. The Defendant continues to demand maintenance and cure. Sean Oakley, FHS's director of human resources since April, 1995, testified that the Plaintiffs have provided Rose with full maintenance and cure since his removal from the ship on June 24, 1994. Based upon a review of the Plaintiffs' records, Oakley testified that, at the time of trial, Costa and FHS had paid over $100,000 in "cure" and $50,000 in "maintenance" to Rose or his medical providers. At trial, the Defendant suggested, and Plaintiffs did not contest, that Rose currently is unable to work, and is unable to afford the cost of long-term chronic dialysis or a kidney transplant.

27. Roth and Arieff attempted to define the terms "curative" and "palliative" as used in the day-to-day practice of medicine. Roth testified that to "cure" a disease is to eliminate the disease to the extent that it is not likely to impact the patient's health in the future. On the other hand, he explained that "palliative" is used to describe a treatment (1) administered to a patient with an illness that probably will take his life over a short, **\*1546** definite period of time, and (2) simply intended to make the patient feel more comfortable. As an example of a palliative treatment, Roth cited chemotherapy for a patient with terminal cancer. He added that he views a treatment as palliative only when he knows the patient's prospects for maintaining life for a meaningful period of time are poor. Roth testified that a third type of treatment, known as "therapeutic," falls between curative and palliative. He defined "therapeutic" as a treatment that, while not capable of curing the patient's underlying disease, is nevertheless capable of sustaining the patient's life in some kind of meaningful sense for a meaningful period of time.[8] As an example, Roth cited the provision of insulin to a patient suffering from insulin dependent diabetes mellitus. He explained that diabetes is not a short-term terminal illness like malignant cancer, and while insulin will not eliminate the diabetes, it does improve the patient's overall medical condition and facilitate his long-term survival. Another example of therapeutic treatment discussed by Roth concerned Wilson's disease. According to Roth, without the administration of penicillamine, a Wilson's disease patient likely will die. With the drug, however, the patient may live normally for many years even though the underlying disease remains in his body. Finally, Roth described coronary artery bypass surgery as

therapeutic, because while the surgery does not cure the underlying coronary artery disease, it ensures that the patient will maintain a sufficient blood flow to sustain life for a meaningful period of time. He added that some procedures can be curative as well as therapeutic. He also noted that while some curative treatments can be life-saving, others (such as the treatment of arthritis) just improve quality of life.

[8]    Plaintiff's counsel asked Roth whether he agreed with the definition of therapeutic found in Taber's Cyclopaedic Medical Dictionary, which Roth described as a recognized dictionary used in medical schools throughout the United States. The definition describes therapeutic as (1) pertaining to results obtained from treating; (2) having medicinal or healing properties; or (3) a healing agent. Roth testified that this definition was acceptable, although he would phrase it differently.

Arieff's definitions, for the most part, mirrored those of Roth. He defined a palliative treatment as one that does little other than make the patient more comfortable, and cited chemotherapy for a terminally ill cancer patient as his example. At some points, he defined a curative treatment as one that either eliminated the underlying disease or eliminated the effects of the disease. At other points, he referred to eliminating the effects of the disease, without eliminating the disease itself, as therapeutic. Arieff, like Roth, described the provision of insulin to a diabetic and penicillamine to a Wilson's disease patient as therapeutic interventions. The Court credits Dr. Roth's description of how the terms curative, palliative and therapeutic are used in day-to-day practice by medical professionals.

Roth testified that kidney dialysis and kidney transplantation are therapeutic treatments, rather than palliative or curative.[9] At one point, Plaintiffs' counsel asked Roth to consider Wilson's disease in the context of a definition of palliative as "a treatment that serves to relieve or alleviate without curing." Roth testified that, using this definition, he would describe Wilson's disease as palliative. Roth also testified, upon further questioning from Plaintiffs' counsel, that if he could not use his preferred term (therapeutic), he would describe dialysis and transplantation as palliative rather than curative procedures. He stressed, however, that medical practitioners reject the palliative/curative duality, and emphasized that Taber's definition of palliative is not the same definition that he or most of his colleagues in the medical profession would adopt.

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

9

Arieff described dialysis and transplantation as curative, using a broad definition of curative that essentially tracked Roth's definition of therapeutic. However, to the extent that Arieff's testimony suggests that dialysis and transplantation are curative, as that word is used by medical practitioners, the Court credits the contrary testimony of Dr. Roth.

Both Roth and Arieff testified that neither dialysis nor transplantation will "cure" IgA nephropathy.

## *1547 II. CONCLUSIONS OF LAW

A. *The Doctrine of Maintenance and Cure*

The general maritime law doctrine of maintenance and cure is of ancient origin. The Laws of Oleron and other medieval sea codes provided special protection for mariners who were injured or fell ill while in the service of their ship.[10] The doctrine has been a part of British maritime law since the Middle Ages, when the Laws of Oleron were brought from France to England, and was incorporated into American admiralty law after the War of Independence.

10

The Laws of Oleron provided in pertinent part:

[I]f the master[ ] orders and commands any of the ship's company be in the service of the ship, and thereby happened to be wounded or otherwise hurt, in that case they shall be cured and provided for at the costs and charges of said ship.

If it happens that sickness seizes on any one of the mariners, while in the service of the ship, the master ought to set him ashore, to provide lodging and candlelight for him ... and likewise to afford him such diet as is usual in ship; that is to say, so much as he had on shipboard in his health, and nothing more, unless it please the master to allow it to him; [and] if he recover, he ought to have his full wages ... [a]nd if he dies, his wife or next kin shall have it.

Appendix, 30 F.Cas. 1169, 1174–75 (1897). Other codes were the Laws of Wisbuy and the Laws of the Hanse Towns. *See id.* at 1191–94, 1200.

[1]   The obligation of a shipowner to provide maintenance and cure under American maritime law was discussed for the first time in *Harden v. Gordon*, 11 F.Cas. 480 (No. 6,047) (C.D.Me.1823). Drawing on his understanding of the singular hazards that attend the work of seamen and the unique relationship between a seaman and his ship or employer, Justice Story cautioned that "[e]very court should watch with jealousy an encroachment upon the rights of seamen,

because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and they are easily overreached...."

Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and from exhausting labor. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. Their common earnings in many instances are wholly inadequate to provide for the expenses of sickness; and if liable to be so applied, the great motives for good behavior might be ordinarily taken away by pledging their future as well as past wages for the redemption of the debt.

*Id.* at 483, 485. As recently as 1962, the United States Supreme Court drew on *Harden* in order to summarize the purpose of the doctrine of maintenance and cure:

The reasons underlying the rule, to which reference must be made in defining it, are those enumerated in the classic passage by Mr. Justice Story ... the protection of seamen, who, as a class, are poor, friendless and improvident, from the hazards of illness and abandonment while ill in foreign ports; the inducement to masters and owners to protect the safety and health of seamen while in service; the maintenance of a merchant marine for the commercial service and maritime defense of the nation by inducing men to accept employment in an arduous and perilous service.

*Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88 (1962) (quoting *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938)). Relying on the principles first articulated by Justice Story, admiralty courts have been liberal in interpreting the doctrine "for the benefit and protection of seaman who are its wards." As a result, the shipowner's liability for maintenance and cure is among the "most pervasive" of all, and is "not to be defeated by restrictive distinctions nor 'narrowly confined.' " *Vaughan*, 369 U.S. at 531–32, 82 S.Ct. at 1000. Ambiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman. *Gaspard v. Taylor Diving & Salvage Co., Inc.*, 649 F.2d 372, 374 (5th Cir.1981) (citing *1548 *Vaughan*, 369 U.S. at 532, 82 S.Ct. at 1000), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982).[11] In other words, "if leeway is to be given in either direction, all the considerations which brought [the doctrine] into being dictate it should be on the sailor's behalf."

WESTLAW

Exhibit 2

**Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)**
1996 A.M.C. 2797

*Aguilar v. Standard Oil Co.,* 318 U.S. 724, 735, 63 S.Ct. 930, 936, 87 L.Ed. 1107 (1943) (adding that "[the] tendency to confine the scope of the [shipowner's] obligation [to seamen] is consonant neither with the liberality which courts of admiralty traditionally have displayed toward seamen, who are their wards, nor with the dictates of sound maritime policy").

**11**   In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**[2]   [3]   [4]**   Maintenance is a per diem subsistence allowance designed to provide the seaman with compensation sufficient to cover his food and lodging until the time of maximum medical improvement. It is intended to encompass the reasonable cost of food and lodging comparable to that received aboard the vessel. Cure represents the cost of medical and nursing care during the seaman's affliction, again until the point of maximum improvement. *See Nichols v. Barwick,* 792 F.2d 1520, 1522 (11th Cir.1986); *DiBenedetto v. Williams,* 880 F.Supp. 80, 86 (D.R.I.1995) (citing Schoenbaum, *Admiralty and Maritime Law,* Vol. 1, § 6–32 at 358 (2nd ed. 1994)). The right to maintenance and cure springs from the seaman's dependence on his ship, and does not turn on fault of the shipowner or the seaworthiness of the vessel. *See Nichols,* 792 F.2d at 1522; *Gaspard,* 649 F.2d at 374 n. 3. Moreover, the cause of the ailment is irrelevant, so long as it manifests itself while the seaman is in the service of his vessel. *See Baker v. Ocean Systems, Inc.,* 454 F.2d 379, 383 (5th Cir.1972).

**[5]**   The burden of proving the right to maintenance and cure rests with the seaman. *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir.1979). In this case, the parties have stipulated that Rose is a seaman who was injured while in the service of the vessel. F. of F., at 1. We find, therefore, for purposes of this Order, that the Defendant had a right to recover maintenance and cure from the Plaintiffs.[12]

**12**   The Court is aware of Plaintiffs' contention that Rose knowingly failed to disclose his kidney disease at the time he was hired by FIS. *Cf. McCorpen v. Central Gulf Steamship Co.,* 396 F.2d 547, 548 (5th Cir.), *cert. denied,* 393 U.S. 894, 89 S.Ct. 223, 21 L.Ed.2d 175 (1968) (holding that maintenance and cure benefits may be denied if, at the time of employment, the seaman deliberately concealed the ailment that became aggravated while in the service of the ship). Pursuant to

the stipulation of the parties, however, we do not address Plaintiffs' affirmative defenses at this time.

*B. Maximum Medical Improvement*

**[6]**   The parties also agree that Rose's entitlement to maintenance and cure continues to the point of maximum medical improvement. Although this seems a rather straightforward concept, its application is not so simple. Once the seaman establishes his right to maintenance and cure, the burden of persuasion shifts to the shipowner to prove that the seaman has reached the point of maximum medical improvement. *See, e.g., McMillan v. Tug Jane A. Bouchard,* 885 F.Supp. 452, 459 (E.D.N.Y.1995). Plaintiffs say their obligation to provide maintenance and cure ended when Rose was stabilized on dialysis after being transferred from the ship to a hospital on shore, because IgA nephropathy was incurable then and now. Rose responds, in essence, that he has not reached maximum medical improvement, since dialysis or a transplant from a matched living related donor undoubtedly create a reasoned prospect of a betterment of his condition. Put simply, according to Rose, these treatments are all that keep him from death.

**[7]**   Throughout time, judges have adopted various formulations of the maximum medical improvement test. *Harden,* while recognizing that a shipowner's duty to provide maintenance and cure extends beyond the voyage itself, did not specify how long after the termination of the voyage these obligations continued. Some nineteenth century courts followed Justice Story's reasoning in a later case, *Reed v. Canfield,* 20 F.Cas. 426 (No. 11,641) (C.C.Mass.1832), **\*1549** by holding that the shipowner is liable until "the cure is completed, at least so far as the ordinary medical means extend." Other courts held that the privilege of a seaman to be cured at the expense of his ship continued no longer than his right to wages under his contract of employment. *See, e.g., Nevitt v. Clarke,* 18 F.Cas. 29 (No. 10,138) (S.D.N.Y.1846). The Supreme Court resolved this debate in *Calmar,* holding that the obligation continues for a "reasonable time" after the voyage:

We can find no basis for saying that, if the disease proves to be incurable, the duty extends beyond a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care and medical treatment. This would satisfy such demands of policy as underlie the imposition of the obligation. Beyond this we think there is no duty....

*Id.* at 530, 58 S.Ct. at 654. In *Farrell v. United States,* 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949), the Court replaced

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

the reasonable time test with the concept of maximum cure, in accordance with the Shipowners' Liability Convention of 1936. Justice Jackson, writing for the majority, suggested that "the duty of the ship to maintain and care for the seaman after the end of the voyage only until he was so far cured as possible" had been part of American admiralty law for years. He reasoned that the doctrine of maintenance and cure "does not hold a ship to permanent liability for a pension, neither does it give a lump sum payment to offset disability based on some conception of expectancy of life. Indeed the custom of providing maintenance and cure in kind and concurrently with its need has had the advantage of removing its benefits from the danger of being wasted by the proverbial improvidence of its beneficiaries." *Id.* at 519, 69 S.Ct. at 711. Thus, in *Vella v. Ford Motor Co.,* 421 U.S. 1, 5, 95 S.Ct. 1381, 1383–84, 43 L.Ed.2d 682 (1975), the Court agreed that "maintenance and cure continues until such time as the incapacity is declared to be permanent."

Lower courts in this Circuit and elsewhere have struggled to come up with a more practical standard to be applied in maintenance and cure actions. In *Sefcik v. Ocean Pride Alaska, Inc.,* 844 F.Supp. 1372, 1373 (D.Alaska 1993), for example, the court stated that maximum cure is reached when "no further improvement in the [seaman's] health" is possible. In *Desmond v. United States,* 217 F.2d 948, 950 (2nd Cir.1954), *cert. denied,* 349 U.S. 911, 75 S.Ct. 600, 99 L.Ed. 1246 (1955), by contrast, the court stated that the shipowner "is liable for maintenance and cure only until the disease is cured," without referring to the seaman's health. To a certain extent, the imprecise language that permeates in the case law is an indication of how infrequently the injuries or ailments for which seaman seek relief push the limits of the doctrine. Nevertheless, this lack of clarity is an indication of how contextually-driven the analysis will be when a court is asked to determine whether a seaman has reached maximum medical improvement. The common law is nothing if not flexible, and must be adapted to fit the peculiar facts and circumstances of individual cases.

The Eleventh Circuit has not addressed the question of when maintenance and cure benefits ought to terminate. *Cf.* Eleventh Cir.Dist. Judges Ass'n, Pattern Jury Inst.: Civil Cases, Fed.Claims Inst. No. 5.2 (1990) (stating that "a seaman is entitled to receive maintenance and cure from the date he leaves the vessel until the point of 'maximum possible cure' under the circumstances, that is, the point at which no further improvement in the seaman's medical condition is to be reasonably expected"). However, the former Fifth Circuit,

whose decisions constitute binding precedent on this Court, settled on a test that looks to the "condition" of the seaman. In *Pelotto v. L & N Towing Co.,* 604 F.2d 396 (5th Cir.1979), the court explained that maximum medical improvement is reached "where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition." *Id.* at 400 (citing *Farrell* ). The court applied this principle to reverse an order of summary judgment that denied the seaman's claim to benefits.

**\*1550** Two years later, the former Fifth Circuit applied the *Pelotto* test in *Gaspard.* In that case, a professional diver brought an action against a salvage company after he developed osteonecrosis in his shoulder joints. Quoting the pertinent language from *Pelotto,* the court explained that "[t]he accepted legal standard holds that maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition." 649 F.2d at 374 n. 3. The court then reversed the district court's rejection of a jury finding that the diver was entitled to damages for the defendant's arbitrary denial of maintenance and cure benefits. *Id.* at 376; *see also Kratzer v. Capital Marine Supply, Inc.,* 490 F.Supp. 222, 229 (M.D.La.1980), *aff'd,* 645 F.2d 477 (5th Cir.1981) (noting that "[m]aximum cure is achieved when it appears that further treatment will result in no betterment of the seaman's condition"). The language of these cases is consistent with prior Fifth Circuit formulations, *see Dobbs v. Lykes Brothers Steamship Co.,* 243 F.2d 55, 58 (5th Cir.1957) (stating that the right to maintenance and cure extends to "a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected from nursing, care and medical treatment"), *cert. denied,* 355 U.S. 835, 78 S.Ct. 56, 2 L.Ed.2d 46 (1957), and continues to be followed in the present Fifth Circuit, *see L.C. Johnson v. Marlin Drilling Co.,* 893 F.2d 77, 79 (5th Cir.1990) (citing *Gaspard* and *Pelotto* and holding that maximum medical cure exists when "it appears probable that further treatment will result in no betterment of the seaman's condition").[13]

---

13      Although a particular decision from the Fifth Circuit after
        October 1, 1981 is not binding upon this Court, such a
        decision can be afforded "great weight" when it is "based
        on cases of the former Fifth Circuit that are binding
        precedent in this Circuit." *AmBrit, Inc. v. Kraft, Inc.,* 812
        F.2d 1531, 1535 36 n. 13 (11th Cir.1986), *cert. denied,*
        481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987).

A review of these opinions makes clear that we are concerned with the seaman's overall medical condition, rather than the

Exhibit 2

**Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)**
1996 A.M.C. 2797

discrete ailment or ailments that afflict him. At times, the Plaintiffs appear to agree that the pertinent question is whether the proposed treatment will "cure or improve the seaman's underlying condition." P'tiff. Supp. Post–Trial Mem., at 2. At other points, however, Costa and FHS seem to argue that the point of maximum medical improvement exists when the seaman's underlying disease is established to be incurable, even if further improvement in the seaman's "condition" is possible. P'tiff. Prop. F. of Fact and Con. of Law, at 22. Language in some older cases from outside this Circuit can be read to support this proposition. In *Muruaga v. United States*, 172 F.2d 318, 321 (2nd Cir.1949), for example, the Second Circuit stated that "when maintenance and cure has brought about all the improvement to be expected in an incurable disease the shipowner's liability ends and thereafter the health of the seaman is at his own risk so far as the shipowner is concerned." Five years later, the Second Circuit echoed *Muruaga* in *Desmond*, by stating that a shipowner "is liable for maintenance and cure only until the disease is cured or recognized as incurable." 217 F.2d at 950. As noted above, however, the pertinent test in this Circuit is whether there is a possibility of a betterment in the seaman's *condition*. *See, e.g., Pelotto*, 604 F.2d at 400.

The word "condition" necessarily encompasses something more than the curability of the specific disease or injury that triggered the need for maintenance and cure. Rather, it requires us to look to the overall physical health and bodily function of the seaman, against the backdrop of the underlying disease or injury as well as the effects of that disease or injury. The broad term "condition" permits a court to tailor the remedial doctrine of maintenance and cure to fit the unique facts and circumstances of the case before it. Moreover, the broad term "condition" is consonant with the general proposition that, in resolving maintenance and cure cases, relief is "not to be defeated by restrictive distinctions," *Vaughan*, 369 U.S. at 531–32, 82 S.Ct. at 1000, and therefore all doubts should be resolved on the sailor's behalf. For all of the foregoing reasons, our inquiry does not end with the fact that IgA nephropathy—the disease principally responsible **\*1551** for Rose's loss of kidney function—has been deemed incurable.

We are aware that the case law sometimes uses the word "palliative" as shorthand to describe treatments administered after the seaman has reached maximum medical improvement. *See, e.g., McMillan*, 885 F.Supp. at 461 (explaining that "as long as the seaman's condition is susceptible to curative as opposed to palliative treatment,

the shipowner is liable for maintenance and cure"). Costa and FHS often use the word palliative to describe their view of further treatment for Rose's kidney ailment. We do not believe, however, that the curative/palliative framework is helpful, at least under the facts and circumstances of this case. To begin with, neither the Plaintiffs' expert, Roth, nor the Defendant's expert, Arieff, described dialysis or transplantation as merely palliative treatments (despite the express invitation of Plaintiffs' counsel). Both experts explained that, in the medical profession, the word palliative is used primarily to refer to treatments administered to patients with terminal ailments who have no genuine prospect of survival for any meaningful period of time. *See* F. of F., at 27. For this reason, both Roth and Arieff testified that, since dialysis and transplantation do offer end stage renal failure patients a genuine prospect of survival for a meaningful period of time, these treatments would not be deemed palliative, as that word is used among physicians. *Id.* Instead, according to Roth and Arieff, dialysis and transplantation would be regarded as "therapeutic" treatments. *Id.*

The term therapeutic, like the terms curative and palliative, has not received meaningful explication in the case law of maintenance and cure. Several former Fifth Circuit panels, however, have suggested in dicta that the shipowner's obligation to support the seaman until the point of maximum medical improvement includes the provision of "therapeutic" benefits. *See, e.g., Gaspard*, 649 F.2d at 374 n. 3 (noting that "cure" involves the payment of "therapeutic, medical and hospital expenses"); *Pelotto*, 604 F.2d at 400 (same).[14] In their proposed conclusions of law, Costa and FHS cite *Travenol Laboratories, Inc. v. United States*, 17 C.I.T. 69, 813 F.Supp. 840 (1993), for the proposition that kidney "dialysis, although therapeutic, is not curative in nature." In *Travenol*, the Court of International Trade considered the healing properties of certain imported dialysis devices in order to ascertain the appropriate customs duties that should have been paid. The relevant statute allowed certain medical items intended for the use or benefit of the disabled to enter the United States without tariff, subject to an exclusion for "therapeutic and diagnostic articles." The court noted that, under *Richards Medical Co. v. United States*, 910 F.2d 828 (Fed.Cir.1990), an imported device does not come within the definition of therapeutic unless it is curative. It therefore held that the devices in question were entitled to enter duty-free, because dialysis does not cure kidney disease and therefore the devices were not therapeutic. *Id.* at 844–45. *Travenol* does not purport to discuss the proper definition of curative or **\*1552** therapeutic outside of the discrete

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

realm of customs duties. More to the point, *Travenol* does not shed meaningful light on the question before us: whether further treatment will result in a betterment of Rose's medical condition. At all events, as *Pelotto* and *Gaspard* suggest, the word therapeutic is not, either in the law or among medical professionals, the mere functional equivalent of palliative. Thus, the Plaintiffs' repeated characterization of dialysis and transplantation as palliative remedies is unhelpful, and has no persuasive support in the record of this case.

14    *See also Johnson v. Ohio River Co.,* 1989 WL 38133 (E.D.Ky. March 14, 1989), *rev'd on other grounds,* 902 F.2d 33, 1990 WL 51412 (6th Cir. April 24, 1990) (unpub. op.). In *Johnson,* a seaman challenged the defendant's cessation of maintenance and cure benefits based on its belief that the seaman's back injuries had reached maximum medical improvement. The seaman had suffered a herniated back. Four doctors opined that the seaman had not reached maximum medical improvement; a fifth concluded that while maximum medical improvement had been reached, additional physical therapy would be beneficial. The district court quoted *Pelotto* for the proposition that a shipowner's obligation terminates "where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition." *Id.* at \*6. It also quoted *Pelotto* as noting that "cure" involves the payment of "therapeutic, medical and hospital expenses." *Id.* The court then entered summary judgment in the seaman's favor, rejecting the Defendant's argument that the rehabilitative therapies undertaken by the seaman would not cure his back injuries, but rather were intended to make those injuries less painful. According to the court, the case was "one in which the seaman was entitled by long established law to maintenance and cure payments for continued therapeutic treatment." *Id.* at \*6 (citations omitted). The Sixth Circuit reversed after finding that genuine issues of material fact remained as to whether the shipowner had acted arbitrarily by ceasing maintenance and cure benefits, but did not question the district court's assumption that therapeutic treatments should come within the doctrine.

We are familiar with no maintenance and cure cases involving an incurable kidney disease that requires treatment in order to sustain life. In *Dobbs v. Lykes Brothers Steamship Co.,* the former Fifth Circuit considered the maintenance and cure request of a seaman who suffered from a kidney ailment diagnosed as "chronic glomerulonephritis (nephrotic stage)." The seaman received six months of treatment for his ailment at a marine hospital. After his doctors concluded that Dobbs

was fit to return to work, he was discharged and directed to return as an out-patient for periodic check-ups. The court of appeals upheld the district court's denial of benefits, quoting the lower court's finding that the seaman, "at the time of his discharge ... had received all the improvement in his condition that reasonably could be expected to result from nursing, care and medical treatment; he had received the maximum benefits available from such nursing, care and medical treatment." 243 F.2d at 57 n. 3.

It cannot be said on this record that Rose has "received the maximum benefits available from ... nursing, care and medical treatment." The record makes plain that appropriate treatment, in the form of dialysis or a transplant, unquestionably will result in a betterment of Rose's medical condition. Without medical attention, Rose will die within a matter of weeks, due to the accumulation of toxins and other consequences of end stage renal failure. F. of F. at 13. With medical attention, however, his bodily function improves to the point that life may be maintained with some degree of normality. Both Roth and Arieff testified, and we find, that dialysis and transplantation offer Rose a reasonable probability to sustain life in a meaningful way and for a meaningful period of time. *Id.* at 15, 17, 22, 25. This is, therefore, not a case where the available treatment does nothing more than ease pain and suffering, or make the patient more comfortable. The difference here is one of life or death.

In the most basic sense, of course, dialysis and a transplant "better" Rose's medical condition by removing toxins and replacing other vital kidney functions that were destroyed as a result of the disease, and would not be performed in lieu of appropriate medical care. *Id.* at 14. Yet dialysis and transplantation will improve other aspects of Rose's condition, among which are his level of blood abnormalities, his overall body chemistry, his cardiac function and the responsiveness of his peripheral nerve system. *Id.* at 14, 20. These changes do more than improve quality of life or simply make him "feel better;" they *extend life,* and make the patient healthier in the most marked and profound sense. We stress that neither Dr. Roth nor Dr. Arieff suggested that no further improvement in Rose's condition would be possible after receiving dialysis or a kidney transplant. *Cf. Tullos v. Resource Drilling Inc.,* 750 F.2d 380, 388 (5th Cir.1985) (noting that termination of the seaman's right to maintenance and cure should be based on an "unequivocal medical determination").

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

[8]   Although the touchstone of our review under binding former Fifth Circuit precedent focuses on the physical condition of the seaman, our resolution of this issue does not turn entirely on the potentially expansive scope of that word. Regardless of whether the point of maximum medical improvement is defined by reference to the seaman's "condition," "incapacity," "illness" or "affliction" (all of which appear in the case law), maintenance and cure, if it means anything, necessarily encompasses a situation where the proposed treatment represents the difference between life at a reasonable level of functioning for an indefinite period of time, and plain, certain and immediate death. The doctrine was designed and intended to hold the shipowner responsible for treatments that move the patient to an improved state of health.   **1553   For purposes of comparison, when the available treatment leaves the seaman feeling better *without* enhancing his bodily function and moving him to an improved state of health, then the point of maximum medical cure has been reached, and the shipowner's liability may be extinguished. Here, dialysis and transplantation will improve Rose's condition in the most profound sense: by creating a reasonable prospect of life for an indefinite period of time at a reasonable level of functioning.

[9]   Since the betterment of condition offered by dialysis or a transplant boils down to the simple question of life or death, this case is dissimilar from those actions where the seaman sought continued benefits for mere pain and suffering associated with an incurable ailment or disease. In *Belcher Towing Co. v. Howard,* 638 F.Supp. 242 (S.D.Fla.1986), for example, the district court denied maintenance and cure to a seaman who had suffered incurable soft tissue injuries that left a lingering pain in his neck and back. In *Lindgren v. Shepard,* 108 F.2d 806 (2nd Cir.1940), the court denied continued maintenance and cure to a syphilitic who required periodic treatments and examinations for the rest of life in order to prevent painful relapses, but not to cure the disease. In *Stewart v. Waterman Steamship Corp.,* 288 F.Supp. 629 (E.D.La.1968), *aff'd,* 409 F.2d 1045 (5th Cir.1969), the court denied further maintenance and cure to an epileptic seaman who sought drug treatments to control his occasional seizures. In *Berke v. Lehigh Marine Disposal Corp.,* 435 F.2d 1073 (2nd Cir.1970), *cert. denied,* 404 U.S. 825, 92 S.Ct. 55, 30 L.Ed.2d 53 (1971) the court denied further maintenance and cure to a seaman who sought relief from the effects of chronic bronchitis where "further treatment would only relieve the symptoms but would not permanently improve the condition." And in *Farrell,* the Supreme Court denied continued maintenance and cure to a seaman who

required occasional care to alleviate headaches and epileptic convulsions stemming from incurable injuries sustained in a fall. 336 U.S. at 519–20, 69 S.Ct. at 711–12. In none of these cases did the seaman seek treatment for an incurable ailment or disease that, unless remedied, would result in his almost immediate death. For this reason, we find these cases unpersuasive on the discrete issue before us, where far more than the alleviation of pain and suffering is at stake and the proposed treatments offer a reasoned prospect of long-term survival. Nevertheless, these opinions underscore the difficult task that courts must undertake when attempting to navigate between the principle that benefits must continue if the available treatment promises meaningful life over certain death, and the countervailing rule that benefits are improper when the available treatment simply make the patient feel better as he nears imminent death.

In their proposed conclusions of law, Plaintiff cite the Second Circuit's opinion in *Muruaga* for the proposition that "treatment for an incurable cardiovascular disease has been deemed outside the scope of maintenance and cure." This is an incorrect characterization of the case. In *Muruaga,* the seaman was diagnosed with an incurable hypertensive cardiovascular disease. The seaman's doctors represented that he would need treatment for the remainder of his life (although the opinion does not suggest that the seaman would have died within a matter of weeks without treatment for the disease). The district court found that the point of maximum medical improvement had been reached. The Second Circuit reversed, stating that "[a]s we cannot tell from this record when, if ever, the [seaman] did reach the point of maximum improvement in his incurable condition," the case would be remanded for a finding on the issue. Thus, even if we were to accept that the cardiovascular disease in *Muruaga* fairly can be analogized to IgA nephropathy, the Second Circuit's opinion is not helpful in resolving the case at bar. Moreover, *Muruaga* is not binding precedent, and does not apply the "betterment of condition" standard that is the law of this Circuit.

Plaintiffs also quote from the Third Circuit's opinion in *Cox v. Dravo Corp,* 517 F.2d 620 (3d Cir.), *cert. denied,* 423 U.S. 1020, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). In *Cox,* a seaman (through his widow) sought maintenance and cure for his injuries. At trial, the evidence established that Cox's injuries were   **1554   permanent and disabling. Although Cox received physical therapy and medications for headaches and dizzy spells attendant to the injuries, Cox's doctor conceded that the treatments simply "made Cox feel better and relieved his aches and pains [since] no cure could

Exhibit 2

**Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)**
1996 A.M.C. 2797

be effected from such treatments and ... they would not arrest Cox's progressively deteriorating physical condition." *Id.* at 622. The district court, relying on two prior Third Circuit cases—*Neff v. Dravo Corp.,* 407 F.2d 228 (3d Cir.1969) and *Ward v. Union Barge Line Corp.,* 443 F.2d 565 (3d Cir.1971)—held that the shipowner was liable for the cost of the therapy and the medication. On appeal, the Third Circuit reversed the district court's order. In reaching this conclusion, the panel retreated from language in *Neff* and *Ward* that could be read to suggest that a shipowner's obligation to provide maintenance and cure encompassed mere palliative treatments of the kind at issue in the case under review:

> [S]o long as palliative treatment to arrest further progress of the disease or to relieve pain is still medically possible, these decisions permit an award of maintenance and cure even when a seaman has become totally and permanently disabled. In the hypothetical context of an illness entirely unrelated to the seaman's employment, a malignancy for example, the rule on its face seems expansive. Such a result is not, we believe, permitted by the definition of maintenance and cure [adopted by the Supreme Court].... It may be sound social policy that vessel and cargo be required to insure against the cost of palliative or preventive care and for maintenance of seamen who become permanently disabled or incurably ill while engaged in the service of their vessel. But the Supreme Court has expressly rejected ... such a rule.

*Id.* at 624, 627. *Cox,* therefore, does nothing more than re-affirm the accepted principle that a shipowner is not required to provide maintenance and cure where the proposed treatments relieve pain and suffering without making the seaman healthier or improving his physical condition. Here, there can be no doubt that further improvement in Rose's condition is possible, whether the benchmark of his improved condition is life or death, or more subtle, but no less significant, developments such as purged toxins, lowered blood abnormalities and enhanced cardiac function. F. of F., at 14. We reiterate that the common law is nothing if not contextual, and under these facts and circumstances, the Plaintiffs are unable to meet their burden of proving that dialysis or a transplant—which offer Rose a reasoned prospect of continued life for a meaningful period of time—will not better the Defendant's condition.

Costa and FHS place a great deal of emphasis on their assumption that the obligation to provide maintenance and cure does not encompass the provision of life-saving insulin to a diabetic (which both Roth and Arieff described as a therapeutic intervention). As support for this proposition,

Plaintiffs cite just two district court decisions from outside the Southern District of Florida: *Richards v. Crescent Towing & Salvage Co.,* 161 F.Supp. 820 (E.D.La.1958) and *Tribune v. United States,* 95 F.Supp. 197 (E.D.Pa.1950). Neither of these cases is on point. In *Richards,* the court actually allowed the diabetic seaman's claim for maintenance and cure, adding that he would be entitled to relief "for the period of his disability or until he reaches maximum recovery." 161 F.Supp. at 821. The court did not attempt to define the point of maximum recovery for purposes of diabetes. In *Tribune,* the court refused to hold a shipowner liable for maintenance and cure based on its failure to provide a diabetic seaman with insulin during his service aboard the ship. The court stated that the seaman was "not entitled to maintenance and cure for life," and that "[u]nder the circumstances of this case, [plaintiff] ha[s] been cured of the effects of [the] deprivation" to the extent that it aggravated his diabetes. 95 F.Supp. at 199–200. In *Tribune,* the question was whether the seaman was entitled to relief for lingering effects of the insulin deprivation, not whether he would be entitled to insulin as part of the shipowner's general obligation of maintenance and cure. For this reason, *Tribune* does not establish that the provision of insulin to a diabetic is a mere palliative treatment. At all events, these cases are neither binding **\*1555** nor persuasive on the discrete issue before this Court.

### C. *Modality of Treatment*

Having concluded that it does not "appear probable that further treatment will result in no betterment of [Rose's] condition," *Marlin Drilling,* 893 F.2d at 79, the question becomes whether he is entitled to a kidney transplant in lieu of, or in addition to, the chronic dialysis that he otherwise needs to sustain life. The Plaintiffs insist that they are under no obligation to provide Rose with a transplant. They contend that, for a person with Rose's demographics, a kidney transplant is likely to be unsuccessful. They further suggest that a transplant is a costly and unusual treatment that goes beyond the remedies properly available under the doctrine of maintenance and cure. *See Rodriguez Alvarez v. Bahama Cruise Line, Inc.,* 898 F.2d 312, 317 (2nd Cir.1990) (noting that a shipowner need not reimburse the seaman for overly expensive or speculative treatments); *Rodgers v. United States Lines Co.,* 189 F.2d 226, 229 (4th Cir.1951) (stating that "an employer is under a duty to provide ordinary and reasonable but not extraordinary medical care"). Finally, they maintain that a transplant will do nothing more than improve Rose's quality of life relative to how he would live if obliged to continue on chronic dialysis.

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

**[10]   [11]**   These arguments are unpersuasive. To begin with, we note that, in some if not all contexts, it is the shipowner's burden to establish that a particular treatment is overly expensive or unnecessary. *See, e.g., Caulfield v. AC & D Marine, Inc.,* 633 F.2d 1129, 1135 (5th Cir.1981) (holding that once a seaman proves that the medical care tendered by the shipowner's chosen physician is inadequate, it is the shipowner's obligation to prove that the medical services eventually obtained elsewhere were excessive); *see also Rodriguez Alvarez,* 898 F.2d at 317 (quoting *Caulfield* ). However the burden is allocated, though, the record indicates that Rose *does* have a reasonable probability of survival with a transplant. F. of F., at 22. Although Plaintiffs insist on describing transplantation as nothing more than a "chance" or a "gamble," given the possibilities of graft failure, the graft survival rates articulated at trial are adequate to establish that there is sufficient likelihood that the H.L.A. identical, living related donor kidney to be transplanted into Rose will function for a meaningful period of time. *Id.* at 23. Moreover, while the Defendant's race and concerns about his possible past non-compliance with physician's orders are factors that may weigh against the efficacy of any transplant, the fact that the kidney to be supplied will be from a matched living related donor is strongly in his favor. *Id.* at 22–23. In addition, Plaintiffs' own expert, Dr. Roth, testified that while blacks may be more at risk than whites when it comes to the likelihood that IgA nephropathy will affect a transplanted kidney, it is "relatively uncommon" for the new kidney to fail as a result of the disease. *Id.* at 6, 9. We also find it significant that Dr. Miller, after extensive and detailed review, has concluded that Rose is a viable candidate for transplant at the University of Miami. *Id.* at 25. Dr. Miller's colleague, Dr. Roth, testified that not every dialysis patient is deemed a viable candidate for transplant. Notably, Roth did not take issue with Miller's conclusion that, notwithstanding concerns about race and compliance, Rose was a reasonable candidate for transplant. *Id.* For these reasons, Plaintiffs' insistence that transplantation is a speculative and exotic procedure that is, at best, a "gamble" for Rose, is unconvincing, and cannot be squared with the comments of Roth and Arieff, both of whom acknowledged that kidney transplants often are used in an attempt to improve the condition of suitable patients who suffer from end stage renal failure. We further note that, although the financial impact of maintenance and cure liability is not a basis to grant or deny benefits to the seaman, both experts testified that a successful transplant imposes higher short-term costs, but ends up considerably less expensive than chronic dialysis if the patient survives for more than three years. *Id.* at 24.

The Plaintiffs nevertheless assert that a transplant, even if successful, will do nothing more than enhance the quality of Rose's life, which puts the procedure outside the boundaries of maintenance and cure. Dr. Roth **\*1556** testified that while he is not convinced that a transplant will increase life expectancy relative to dialysis, the procedure does offer patients more freedom and comfort in their daily lives. *Id.* at 17. Dr. Arieff disagreed with Roth's conclusion that the evidence is not sufficiently compelling to state that transplantation increases a patient's life expectancy. *Id.* at 17, 25. We need not conclusively resolve this issue, however, because both experts agreed that, independent of any prospect for longer life, a successful transplant does certain things to improve the patient's actual bodily condition that dialysis cannot do. We reiterate that:

> Despite their differing views on the efficacy of transplantation as a life-saving treatment, [the] experts agreed that the successful recipient of a transplant often will show objectively verifiable improvement over a similarly situated patient on chronic dialysis. Roth explained that a properly functioning new kidney will do a superior job of removing toxins and excess fluids than dialysis, thereby creating a better chemical balance in the body and making the patient, on balance, "healthier" than before. In addition, a healthy kidney produces hormones that increase the number of red blood cells, and helps to stabilize blood pressure levels and correct anemia. Arieff testified that a transplant, unlike dialysis, also will (1) arrest the progressive decline in the patient's IQ; (2) improve the patient's peripheral nerve system, making muscles stronger, providing more energy and reducing the likelihood of impotence; (3) arrest the deterioration of the patient's bones; (4) improve the condition and appearance of the patient's skin; and (5) help reduce the intermitted weight gain often associated with dialysis.

*Id.* at 20. Thus, a successful transplant will better Rose's physical condition to a greater extent than will chronic dialysis. We are mindful of the serious risks associated with a kidney transplant, stemming from the surgery itself and the subsequent administration of anti-rejection drugs. *Id.* at 18. It is conceivable, therefore, that the effect of a transplant will be to worsen, rather than improve, Rose's condition. On this record, however, we conclude that the probability of a betterment in the Defendant's condition as a result of a transplant is sufficient to bring this treatment within the Plaintiffs' maintenance and cure obligation.

Exhibit 2

Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)
1996 A.M.C. 2797

[12]   The Plaintiffs argue the doctrine of maintenance and cure cannot be construed in a manner that creates for the shipowner an "open-ended" obligation that might continue for the duration of the seaman's life. In other words,

> When a seaman breaks his arm, contracts a fever in a foreign port, or develops diabetes, the shipowner can at least predict his obligations under maintenance and cure and know when that obligation will end. The arm will heal—either fully or as much as it is going to—and the shipowner's obligation will end. The fever will run its course and the shipowner's obligation will end. The diabetes will stabilize and the shipowner's obligation will end. But the day will never come when Rose will be pronounced "cured." ... For if Rose's employers are told that they are obligated to pay now, then so long as Rose lives, such payments can never be pronounced enough.

P'tiff. Prop. F. of Fact and Con. of Law, at 33. We do not agree that these concerns preclude relief under the facts and circumstances of this case. Indeed, nothing in the law of Admiralty suggests that a shipowner's obligation to provide maintenance and cure is extinguished due to the financial burden of the undertaking or the length of time that is needed to effect a betterment of the seaman's condition. *Cf. In Re Sea Ray Marine Servs., Inc.,* 105 B.R. 12, 13 (Bankr.E.D.La.1989) (holding that maintenance and cure must be provided even during the pendency of the shipowner's bankruptcy proceeding); *Sobosle v. United States Steel Co.,* 151 F.Supp. 767, 769 (W.D.Pa.1957) (suggesting that "maintenance and cure must continue until every approach reasonably known to medical science is applied in an effort to cure the seaman").

Plaintiffs' suggestion that there must be a definite and absolute end point for maintenance and cure awards is not well-founded. Courts have long recognized that a seaman **\*1557** deemed to be at the point of maximum improvement because medical science cannot now produce a betterment of his condition is entitled to seek the resumption of benefits if, at some point in the future, a treatment for his condition is discovered. *See, e.g., Farrell,* 336 U.S. at 519, 69 S.Ct. at 711 (noting that the shipowner "does not contend that if [the seaman] receives future treatment of a curative nature he may not recover in a new proceeding the amount expended for such treatment and for maintenance while receiving it"); Gilmore and Black, *The Law of Admiralty,* (2nd ed. 1975), at 300 (noting that "[t]he shipowner's liability ... appears to be unlimited in time and can be revived, with respect to an apparently hopeless case, by [advances in medical knowledge] which make a resumption in treatment advisable"). In this sense, therefore,

the shipowner's obligation *may* continue for the life of the seaman. We also point out that Rose's counsel stated at oral argument that the Plaintiffs' obligation would cease once Rose received a transplant and thereafter reached a point of stabilization.[15] In light of this representation, the Plaintiffs' fear that they will be required to reimburse the Defendant for an "endless round of surgery, dialysis and more surgery" if the transplant fails is less persuasive. At all events, the Court may, upon appropriate application from the parties, consider again the scope and duration of Plaintiffs' obligation in light of future developments affecting Rose's condition.

[15]   Defendant's counsel acknowledged, however, that if Rose did not receive a transplant, the Plaintiffs' maintenance and cure obligations might continue indefinitely.

### D. Conclusion

The application of traditional concepts of maintenance and cure to this case is not without question. The rapid advance of contemporary medical knowledge, coupled with the development of highly expensive, but extraordinarily promising, treatments like dialysis and transplantation, greatly expands the panoply of procedures that must be exhausted before an ill or injured seaman reaches the point at which no further "betterment of his condition" is conceivable. At the same time, wages and working conditions have improved for seamen:

> Since the adoption of the seaman as a ward of the court, drastic changes have occurred in the maritime industry. Flogging and corporal punishment have been banned from United States flagged vessels, and 'crimping' is illegal. Living conditions aboard ship have been upgraded due to the action of the Maritime Commission, and the traditional blue water maritime industry is almost completely unionized. Justice Story's friendless seaman laboring for meager wages has evolved into a highly compensated union member, well educated both vocationally and in matters pertaining to his industry.

Haugen, *Maintenance and Cure: Contract Right or Legal Obligation,* 62 Tul.L.Rev. 625, 632–33 (Feb. 1988). Moreover, collective bargaining agreements and federal statutes like the Jones Act now supplement, and in some cases supplant, the traditional common law remedies for seamen who are injured while in the service of their vessel. These developments have taken place against the backdrop of an American maritime industry increasingly dominated by foreign-flagged vessels.

WESTLAW

Exhibit 2

**Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)**
1996 A.M.C. 2797

It does not follow, however, that the doctrine of maintenance and cure now is obsolete. The Third Circuit considered this issue in *Barnes v. Andover Co. L.P.,* 900 F.2d 630 (3d Cir.1990). In *Barnes,* a unionized seaman brought suit to establish that his right to maintenance was not limited by the terms of a collective bargaining agreement. The district court found that the maintenance rate set in the agreement was not binding on a seaman who can show higher daily expenses. The Third Circuit affirmed this conclusion. In so doing, however, the Court of Appeals rejected the shipowners' argument that the traditional reasons for concern about the welfare of seamen are no longer persuasive:

Andover argues that the rationale underlying the right of maintenance, which is predicated on the special status of seamen as "wards of the admiralty," is no longer valid. It is true that almost every case concerning the right to maintenance relies **\*1558** on Justice Story's description of the seaman as "generally poor and friendless, and acquir[ing] habits of gross indulgence, carelessness and improvidence." Andover is persuasive in arguing that today those seamen who are unionized are neither friendless nor improvident.... The changed circumstances of the unionized seaman may undercut the rationale supporting the traditional right to maintenance and cure, at least for unionized seamen. However, the Supreme Court has shown no inclination to depart from its long-established solicitude for seamen. Until it does so, we see no basis to assume that the emergence of powerful seamen's unions ... justifies our ignoring the Court's clear and frequent pronouncements that seamen remain wards of the admiralty.

900 F.2d at 636–37 (citations omitted). Indeed, the United States Supreme Court has consistently expanded, rather than contracted, maintenance and cure rights over the decades. For example, the ancient sea codes required that the seaman's injury take place while he was on the ship. In *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943), however, the Court held that a seaman was entitled to maintenance and cure even though he suffered his injury while going ashore to repair a conduit through which the vessel discharged cargo. In *Aguilar,* the Court held that a seaman who was injured either while departing from or returning to his vessel on authorized shore leave was entitled to maintenance and cure. And in *Warren v. United States,* 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503 (1951), the Court extended the protection of maintenance and cure to accidents on land that occur during shore leave. *See also Fitzgerald v. United States Lines Co.,* 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963) (holding that a seaman's maintenance

and cure benefits cannot be reduced even if he is shown to be contributorily negligent). These cases make clear that the Supreme Court has not, despite profound advances in medical technology and changes in maritime commerce, retreated from the proposition that "if leeway is to be given in either direction, all the considerations which brought [the doctrine] into being dictate it should be on the sailor's behalf." *Aguilar,* 318 U.S. at 735, 63 S.Ct. at 936. Nor has the Eleventh Circuit indicated that the doctrine has lost its essential purpose.

At its core, maintenance and cure, like negligence and other common law doctrines, is essentially about allocating cost, benefit and risk. At least at first blush, it is not unreasonable for the law to require a shipowner to provide medical care to one of its crew members—who is capable of meaningful medical improvement after suffering an ailment while in the service of the ship—as part of the cost of doing business. After all, a shipowner may always reduce its risk of liability by ensuring that its crew members are healthy and have properly disclosed their medical condition prior to employment. The fact that the courts have not declared maintenance and cure to be obsolete underscores the continuing vitality of this kind of risk/benefit analysis, and reflects the relative ease with which this flexible doctrine can be tailored to accommodate the unique facts and circumstances of specific cases with the implications of advancing medical science. At all events, the Plaintiffs have not argued, and we are not under these circumstances prepared to hold, that the doctrine, in its traditional, expansive form, imposes an unreasonable burden on shipowners without furthering its original purpose of protecting "friendless" seamen and spurring the growth of the American maritime industry. Moreover, this Court is bound to follow controlling precedent of the Eleventh Circuit and the former Fifth Circuit.

Under *Pelotto* and *Gaspard,* the point of maximum medical improvement is not reached until there is no possibility of a betterment in the seaman's physical "condition." The record establishes that dialysis and transplantation offer Rose a reasonable chance of continuing life for an indefinite period of time at a meaningful level of functioning. The record also establishes that, without these treatments, Rose faces certain and immediate death. The Plaintiffs cannot, under these facts and circumstances, meet their burden of proving that dialysis *and* **\*1559** transplantation do not offer a meaningful prospect of bettering Ewart Rose's condition.

It is, therefore,

Exhibit 2

**Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538 (1996)**
1996 A.M.C. 2797

ORDERED AND ADJUDGED that the Plaintiff has not reached the point of "maximum medical improvement" for purposes of the doctrine of maintenance and cure.[16]

[16]    In their proposed Findings of Fact and Conclusions of Law, the Plaintiffs argue that, even assuming the point of maximum medical improvement has not been reached, Costa and FHS have no obligation to provide Rose with continued cure unless and until he proves that he cannot obtain government subsidized or other "free" health care. This issue also is raised in the Plaintiffs' Motion to Compel Defendant to Apply for Federal, State and Local Aid, or in the Alternative to Authorize Plaintiffs to File Applications on his Behalf, filed January 23, 1996. The question of Rose's obligation to seek public funds to cover his living expenses and the cost of a transplant or continued dialysis was raised unilaterally in the joint pre-trial stipulation. *See* "Issues of Fact Which the Plaintiffs Assert Remain to Be Tried," Joint Pt. Stip., at 13 ¶ 15. In its Order of November 15, 1995, however, the Court limited the issue to be tried to "maintenance and cure and the specific question of maximum medical improvement." For this reason, we will not address the Plaintiffs' arguments on this issue at this time.

The Court will consider the issue as it is framed in the Plaintiffs' motion to compel. We are, however, aware of *no* case from the Eleventh Circuit or the former Fifth Circuit that supports the proposition that a seaman's failure to prove that he has exhausted all conceivable avenues, federal, state or local, for obtaining "free" medical assistance somehow precludes a finding that the seaman has not reached the point of maximum medical improvement and therefore is not entitled to benefits from a shipowner. On their face, the decisions cited by the Plaintiffs—*Moran Towing & Trans. Co. v. Lombas*, 58 F.3d 24 (2nd Cir.1995) and *Toulson v. Ampro Fisheries, Inc.*, 872 F.Supp. 271 (E.D.Va.1995)—do not support the relief that the Plaintiffs seek. For example, these decisions do not hold that the seaman must prove his ineligibility

for anything other than benefits under the federal Medicare and Medicaid program. They do not hold that the seaman must prove his ineligibility for state or local, as opposed to federal, aid. Neither do they hold that the seaman must prove his ineligibility for food stamps and other benefits that would otherwise come within the shipowner's "maintenance" obligation. *See Toulson,* 872 F.Supp. at 277 n. 12 (limiting its holding to "the duty to cure an injured seaman; the [shipowner's] obligation of maintenance is *in no way modified*") (emphasis added). These issues, among many others, are not adequately addressed in the parties' memoranda of law. To this end, Costa, FHS and Rose shall, on or before July 31, 1996, submit supplemental briefs on the Plaintiffs' motion to compel. These briefs should address the matters raised in this footnote, and comment on (1) how, if at all, the reasoning of *Moran* and *Toulson* may be squared with the binding precedent of this Circuit; (2) the nature of the Plaintiffs' "cure" obligation in the event that Rose is found to be Medicare or Medicaid eligible, but these programs do not cover the full expense of chronic dialysis, a kidney transplant or related medical services; and (3) the effect, if any, of Rose's entitlement to health insurance benefits through his employer(s). Any replies to these briefs may be submitted on or before August 9, 1996. We emphasize that the pendency of their motion to compel shall not in any way relieve the Plaintiffs of their obligation to provide maintenance and cure in accordance with this Order. We also note in passing that Rose has applied for, and been denied, cash monthly benefits and Medicare benefits under the Social Security disability program. *See* Def. Notice of Filing, November 30, 1995.

DONE AND ORDERED.

**All Citations**

939 F.Supp. 1538, 1996 A.M.C. 2797

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 2

IN THE CIRCUIT COURT OF THE
17ᵀᴴ JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 2021-CA-009008

DARWIN HUMBERTO CORTEZ MARTINEZ,

      Plaintiff,

v.

MSC CRUISES S.A. CO.,
MSC MALTA SEAFARERS COMPANY LIMITED,
and MSC CRUISE MANAGEMENT (UK) LTD.,

      Defendants.

_____/

## NOTICE OF FILING SWORN MEDICAL REPORT OF LAWRENCE H. BYRD, M.D., F.A.C.P.

1.  Enclosed herewith is a six (6) page report, dated May 10, 2021, that I prepared in the matter of Darwin Humberto Cortez Martinez.

2.  I hereby swear under the laws of the U.S. and the penalties of perjury that the opinions contained in the report are mine, are authentic, and are true and correct (notary not required pursuant to 28 U.S.C. § 1746).

Dated: July 6, 2021.

*Lawrence H. Byrd* FACP

Lawrence H. Byrd, M.D., F.A.C.P.
Rutgers Medical School
185 S Orange Ave,
Newark, NJ 07103

Respectfully submitted,

LIPCON, MARGULIES,
& WINKLEMAN, P.A.
*Attorneys for Plaintiff*
One Biscayne Tower, Suite 1776
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 373-3016
Facsimile: (305) 373-6204

By: */s/ L. Alex Perez*
MICHAEL A. WINKLEMAN
Florida Bar No. 36719
mwinkleman@lipcon.com
JACQUELINE GARCELL
Florida Bar No. 104358
jgarcell@lipcon.com
L. ALEX PEREZ
Florida Bar No.: 125452
aperez@lipcon.com

# Lawrence H. Byrd, M.D., F.A.C.P.

May 10, 2021

Alex Perez & Michael Winkleman
Lipcon, Margulies & Winkleman, P.A.
2 South Biscayne Boulevard, #1776
Miami, Florida 33131

Re:  Darwin Cortez

Dear Mr. Perez and Mr. Winkleman:

I reviewed the following medical records on Mr. Darwin Cortez
(Date of Birth:  9/3/90):

<u>Review of Records</u>

Pre-employment medical exam records/lab results; shipboard
medical records; and post-shipboard medical records/lab results.

Mr. Cortez was hired by MSC at age 21 and remained employed
there for about nine years.  His general health was excellent,
with no chronic conditions, no prescribed medications, and high
level of physical fitness with exercise five to six times per
week.  He aspired to a long career and job advancement, hoping
to build a better life for his family.  He joined the MSC Poesia
on 9/6/19, beginning what we believe to be his ninth contract
(crewmembers generally work on six-to eight-month contracts).
His pre-employment physical on 4/26/19 was unremarkable:  Normal
kidney function, normal urinalysis, normal BP of 110/70, and
normal blood sugar and hemoglobin.  Mr. Cortez sought medical
care, shipboard, on 9/16/19 because of an occipital headache (a
typical location for someone with high blood pressure).  His BP
was recorded at 180/100, extraordinarily high for a previously
healthy man of age 29.  Dr. Guifaro Martinez diagnosed him as
"secondary hypertension," stating that he had a history of
uncontrolled hypertension (clearly untrue).  The presumption of
secondary hypertension in a young patient should trigger a
search for the cause, but no diagnostic tests were ever ordered.
A bare minimum would have included urinalysis, creatinine, BUN,
and electrolytes, all easily available on a ship.  He was
prescribed enalapril 20 mg twice a day and furosemide 25 mg
daily and was discharged, "follow-up required."  However, no
effort was made to recheck his BP, and 26 days later on

Re:  Darwin Cortez
May 10, 2021
Page 2


10/22/19, he returned to clinic because of an injured right
index finger.  He was seen by Dr. Darko Radulovic and his BP was
recorded as 120/70, the only normal reading ever obtained while
on the ship and a dubious BP reading at that.  He returned as
requested the next day, about four weeks after the alarming
finding of a BP of 180/100.  Why was he asked to return one day
after a "normal" reading, when there had been no interest in his
response to two potent antihypertensive medications for nearly
one month?


On 10/23/19, he returned to clinic and his BP was recorded as
160/100.  Once again, the diagnosis was listed as secondary
hypertension and no diagnostic tests were deemed necessary.  For
reasons not articulated in the notes, he was given ketoprofen 80
mg daily for three days.  Ketoprofen is a nonsteroidal anti-
inflammatory agent known to raise BP and to potentially be toxic
to the kidneys.  The kidneys should have been the primary focus
of diagnostic testing in a young man with presumed secondary
hypertension, but no investigation was undertaken.  Atenolol 50
mg twice a day was added.


Mr. Cortez was next seen about two weeks later on 11/7/19 with
painful, frequent urination and his BP was 180/100.  He was
treated with an antibiotic, trimethoprim, for five days and once
again, inexplicably, no diagnostic tests were done.  There was
not even a urinalysis or urine culture, let alone a blood test.
The stated diagnoses were urinary tract infection and secondary
hypertension.  Valsartan 80 mg was prescribed in low dose, which
made very little sense.  It has a mechanism of action very much
like enalapril, but at this dose would clearly be inferior to
enalapril.  After that encounter with severely elevated BP and
the new medication added, no effort was made to recheck him in
timely fashion.  Instead, he returned about six weeks later when
follow-up should have occurred within 10 to 14 days.  That visit
on 12/18/19 demonstrated a BP of 160/100, still unacceptably
elevated.  He was again prescribed the initial drug choice of
enalapril 20 mg b.i.d., despite the apparent failure of that
drug earlier.  There was no mention of heartburn or other
gastrointestinal symptoms, yet he was given lansoprazole 30 mg
daily, which is a so-called PPI.  This class of drug has been
implicated as a potential cause of chronic kidney disease.  So,
he received a potential kidney toxin for no evident reason.


He returned to clinic the next day, 12/19/19, because of a
"strong headache."  The chart noted a "history of periodical

Re:  Darwin Cortez
May 10, 2021
Page 3

high blood pressure and periodical use of antihypertensive
medication."  Just to be clear, his BP was severely elevated
every time he was seen with that one dubious exception.  His
elevated BP was anything but periodical, since it was sustained
at very high levels.  Moreover, any periodical pattern of
antihypertensive medication use was driven solely by the failure
of medical staff to properly treat and continue treatment as
well as monitor BP levels.  So, what was the next therapeutic
step taken by medical staff?  He was now given captopril, an ACE
inhibitor similar to enalapril, but even less likely to control
BP because of grossly ineffective dosing of 25 mg daily for a
drug that is meant to be dosed three times per day.  It also has
an action essentially identical to enalapril, which in a much
higher, more effective dosage did not lower BP.  His blood
pressure at that time was 180/110 again!

He returned two days later on 12/21/19 with a headache and BP
was 180/100.  He was diagnosed with "hypertensive
encephalopathy," implying that he was cognitively impaired, such
as confused, disoriented, etc.  However, the chart states that
he was alert, cooperative, and oriented to time, person, and
place with a normal neurologic exam.  So, he certainly did not
have hypertensive encephalopathy.  He was then treated acutely
with nifedipine 20 mg sublingually to lower BP.  That is a
practice that has been known to be dangerous and has been
strongly discouraged for about 35 years.  He was also prescribed
nimesulide 100 mg, a drug I have never seen utilized.  It is
banned in the U.S. and Europe because of a high risk of serious
adverse effects.  His seventh and last visit was on 12/23/19,
when he was given another BP medication, Micardis 40 mg and
amlodipine 5 mg, and was deemed "unfit to work" and "fit to
fly."  He was instructed to return to his hometown for further
evaluation and treatment.  A shoreside specialist, Dr. Fernardo
Edelberg, stopped furosemide and suggested "complete studies of
kidneys."

He was then admitted to Hospital Centro Medico Sonsonate with
nausea, vomiting, and diarrhea on Christmas day, 12/25/19.  He
had severe hyponatremia with a serum sodium of 117 with normal
being 135 to 145 and life-threatening hyperkalemia, with a
potassium of 6.8 where normal is considered 3.5 to 5.0, and
kidney failure (creatinine of 12.7 with normal up to 1.3).  His
BP was 160 to 164 over 100 to 110.  A hemodialysis catheter was
inserted and he underwent hemodialysis to remove the toxins that
his failed kidneys were not getting rid of.  I have not been

Re:  Darwin Cortez
May 10, 2021
Page 4

able to review medical records since that time, but have been
informed that he remains in end-stage kidney failure, dialysis
dependent.  His type of dialysis was changed at some point from
hemodialysis to peritoneal dialysis, which is done seven days
per week.

<u>Discussion and Conclusion</u>

I shall now address four important issues regarding this case
(Cortez versus MSC).

First problem, with respect to causation:  He developed end-
stage kidney failure because his shipboard medical care was
callously inept, lacking in the most basic principles known to
most second-year medical students.  He had seven clinic visits,
all but one exhibiting totally unacceptable BP readings for any
age, let alone a healthy 29-year-old.  The response was brief,
poorly conceived treatment, with a total lack of follow-up for
an employee working no more than five-minute walk away from that
clinic.  To make matters worse, he was repeatedly diagnosed with
"secondary hypertension," which should have triggered an
immediate search for a cause.  Kidney disorders should have been
at the top of that list for any physician in this situation.
Simple tests like urinalysis and blood tests with kidney
function such as creatinine and BUN would have revealed the
problem.  However, seven visits later, the most rudimentary of
investigations had never been undertaken, nothing at all.  Not
only was he treated in grossly incompetent and negligent
fashion, but the treating physicians essentially poured gasoline
on a burning fire.  He was treated with a nonsteroidal anti-
inflammatory for no reason, which they knew, or should have
known, would further raise his BP, counteract the effect of
blood pressure medicines, and potentially damage his kidneys.
He was similarly treated with a PPI drug, which is known to
potentially hurt the kidneys, and again there was no discernible
reason to have prescribed it.  When the physicians became more
desperate, the treating shipboard doctors misdiagnosed him as
"hypertensive encephalopathy," then treated him with two totally
inappropriate medications (nifedipine 20 mg sublingual and
nimesulide).  There simply is no justification whatsoever and no
amount of rationalization to explain the many, multilayered
errors of omission and commission in this case.  The outcome was
not inevitable:  It was avoidable with even a minimum of
adequate medical care.

Re:  Darwin Cortez
May 10, 2021
Page 5

The second issue to be addressed is Mr. Cortez's prognosis.
Life expectancy with end-stage kidney failure is dramatically
shortened.  His life expectancy on dialysis is likely in the
range of 5 to 10 years, on average.  His best chance for
survival and an improved quality of life is kidney
transplantation.  However, he will face several obstacles,
including shortage of kidneys, a long wait list for transplant
(often three to five years), medical clearance by a transplant
team, and a huge financial burden.

The third issue is that of necessary treatment.  Without
dialysis, Mr. Cortez would likely survive less than one month.
In addition, a variety of medications is needed:  The average
dialysis patient takes 19 pills per day, at a staggering cost.
Ideally, every young patient should receive a kidney transplant,
but significant obstacles exist as noted above.

The fourth issue is MMI:  Is Mr. Cortez at maximum medical
improvement?  The fact that his condition of end-stage kidney
disease is "chronic" is irrelevant.  What matters here is
whether treatment can result in improvement of his medical
condition.  In my opinion, he is unquestionably not at MMI.  He
can benefit from medications that improve anemia which is the
result of kidney failure, medications to control blood pressure,
and medications to minimize cardiovascular complications, which
are the number one cause of death in patients with kidney
failure.  Most importantly, kidney transplantation has the
potential to transform his life, qualitatively and
quantitatively:  I have patients who have received a kidney
transplant more than 35 years ago and are alive today, fully
enjoying retirement and grandchildren.  That is highly unlikely
for anyone in Mr. Cortez's situation.

The sad truth in this case is that Mr. Cortez finds himself in
this unenviable situation directly because of gross negligence,
incompetence, and callous disregard for his well-being on the
part of the medical staff aboard the ship, Poesia.  No effort
whatsoever was ever made to search for the cause of his
hypertension.  The term secondary hypertension alone should have
signaled the need to investigate, using even simple tests easily
available on a ship.  He was examined seven times and never once
was something as simple as a urine or blood test ordered.  The
choices of medication were haphazard, ill conceived, and totally
failed to control his blood pressure as it destroyed his
kidneys.  To make matters worse, they chose to give him

Re:  Darwin Cortez
May 10, 2021
Page 6

medicines toxic to the kidneys for no obvious reason, including NSAIDs particularly.  Mr. Cortez was severely and permanently injured by these errors of omission and commission. Hypertension is the second leading cause of kidney failure after diabetes, resulting in about one-quarter of the cases of end-stage kidney failure.  The tragedy in this case is that this was all avoidable and not at all inevitable.  The medical staff had so many opportunities to effectively intervene, and never did they do so.

If I can be of further assistance to you regarding this matter, please feel free to contact me.

Sincerely yours,


LAWRENCE H. BYRD, M.D., F.A.C.P.
Clinical Assistant Professor of Medicine
Rutgers Medical School

LHB:etran/sc